## GOVERNMENT EMPLOYEES INSURANCE COMPANY *v.* TAYLOR ET AL.

[No. 26, September Term, 1973.]

*Decided October 11, 1973.*

12

The cause was argued before BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Frederick J. Green, Jr.*, with whom were *Lord, Whip, Coughlan & Green* on the brief, for Government Employees Insurance Company.

*Robert J. Thieblot*, with whom were *Allen, Thieblot & Alexander* on the brief, for Martha and Henry Taylor.

*H. Thomas Howell*, with whom were *David M. Buffington* and *Semmes, Bowen & Semmes* on the brief, for Interstate Credit Development Corporation.

DIGGES, J., delivered the opinion of the Court.

For the first time, we are presented with a case requiring a construction of Maryland Code (1957, 1972 Repl. Vol.), Art. 48A, §§ 486A-G, which was designed and enacted by the General Assembly originally in 1964 to regulate insurance premium finance agreements in this State. Very simply stated, a premium finance agreement permits a financial institution (the premium finance company [1]) to secure the loan it makes to a prospective insured by retaining the power, upon default, to cancel the insurance policy procured

---

[1] A premium finance company is defined in Maryland Code (1957, 1972 Repl. Vol.), Art. 48A, § 486A (b) to be "any person who engages in the business of entering into or accepting premium finance agreements."

14

through that loan and recover any unearned premium as a credit on the borrower's indebtedness. Though tangentially concerned with the entire statute, in order to answer the questions presented by this appeal, we will focus principally on the cancellation provisions contained in § 486F.

This declaratory judgment action, though instituted by the insureds, Martha and Henry Taylor, appellees,[2] presents primarily a dispute between Government Employees Insurance Company (GEICO), appellant, and the Unsatisfied Claim and Judgment Fund Board (Fund) as to which of the two must defend the Taylors from liability claims made as a result of an automobile accident on August 4, 1966 and pay any judgments which may be rendered against them.[3]

The principal facts are not in dispute and are here summarized from the stipulation of counsel filed in the trial court. These facts reveal that in early December of 1965 the Taylors, with the assistance of the Allrisk Insurance Agency, contacted a premium finance company, Interstate Credit Development Corporation (ICDC), an additional appellee, and arranged with it to finance the premium of an automobile liability insurance policy Henry Taylor was purchasing from GEICO. The Taylor-ICDC financing agreement required that the borrowers make eight monthly installment payments to discharge their loan obligation. In addition, it granted ICDC the power, typically contained in premium finance agreements, to cancel the insurance policy and to recover any unearned premium in the event that the Taylors defaulted in their repayment obligation. At the latest, GEICO became aware of the existence of this contract when that company accepted ICDC's draft in payment of the Taylor's policy premium and then endorsed it just below a statement which read:

> "By endorsement hereof the insurer hereby

---

2. The Taylors have cross-appealed and raise a question which we will discuss *infra*; GEICO there is the cross-appellee.

3. Though named as parties in this action, the injured claimants have shown little interest in this dispute, perhaps because the maximum amounts which they can recover under the insurance policy and from the Fund are probably the same.

acknowledges that the policy for which this draft constitutes payment of premium has been assigned to ICDC Inc., and in the event of cancellation of said policy for any reason the insurer agrees to pay all unearned premium refunds to ICDC."

In due course, the Taylors received from GEICO their insurance policy and a payment book from ICDC which informed them that the first monthly payment would be due on January 4, 1966. When neither the first installment nor the one due on February 4 was received, the finance company sent the Taylors past due notices informing them that delinquent charges had been added and that unless payment was made within five days [4] it would be forced to order cancellation of the insurance policy which secured its loan. Despite these admonitions, payment was not received [5] and thereupon ICDC, on February 14, dispatched to the Taylors a "Notice of Default" and "Notice of Cancellation" stating that since the overdue installments had not been paid the "default to date constitutes an election by you [the Taylors] to cancel [your] policy," and that "in accordance with the authority which you have given us in consideration of our financing the premium" your policy is cancelled effective February 28, 1966. This cancellation announcement was also sent to GEICO containing a provision for the insurer which stated:

"This is a true copy of the Notice of Cancellation which was served upon the insured cancelling the policy listed below .... The return premium is to

---

**4.** Art. 48A, § 486F (b) and (c) require that not less than 10 days' written notice of cancellation be given the insured at the expiration of which the premium finance company may notify the insurer of the cancellation specifying the date it desired that the cancellation become effective. Whether there was compliance with this notice requirement is one of the issues raised in this action. But, as we base our decision on other grounds, it becomes unnecessary to pursue that question.

**5.** The record indicates that the Taylors may have made some payments in February and March to the Allrisk Insurance Agency, none of which ICDC admits receiving. However, because of the view we take of this appeal, whether or not these payments were in fact made becomes irrelevant.

be calculated as of the effective date of cancellation indicated."

With this notice, communications between the finance company and the Taylors ceased, but a skirmish through the exchange of letters began between GEICO and ICDC concerning the return of the unearned premium. First, on March 7, the insurance company requested that it be supplied with a copy of the Taylor-ICDC financing agreement. Although furnished this document on March 10, and despite the fact that on April 28 it did notify the Taylors their policy was cancelled effective April 21, GEICO continually failed to respond to the finance company's repeated requests throughout April and May that the unearned premium be returned. In fact, it was not until September 22, almost two months after Mrs. Taylor, while operating her husband's automobile with his permission, was involved in a collision on August 4, that GEICO finally responded by sending ICDC a check in the amount of the unearned premium calculated as of April 21.

On August 12, eight days following this mishap, the Taylors wrote GEICO informing it of the accident and that claims for resulting damages were being made against them. The insurance company answered their letter by stating that the policy of insurance covering the Taylor automobile had been cancelled on April 21 and, therefore, its obligation had ceased as of that date.

When those claiming damages against the Taylors became aware of GEICO's contention, they notified the Fund of the accident and of the possible claims against it. Upon receipt of this notice, the Fund referred the matter to the General Adjustment Bureau (GAB), an insurance adjusting agency, for investigation and whatever other action it deemed appropriate. The course of action selected was the institution of this declaratory judgment suit in the Court of Common Pleas of Baltimore City, which was brought in the Taylors' names and with their consent, requesting a declaration that the insurance policy issued by GEICO, covering the Taylors' automobile, was in full force and effect

on August 4 at the time of the accident because there had been no compliance with the cancellation provisions of § 486F. When Judge David Ross made this requested declaration, GEICO appealed. We shall affirm that judgment of the trial court for reasons which we think logically flow from the discussion that follows.

Locomotion by motor vehicle has practically become a *sine qua non* for most of this country's population and since automobile liability insurance is now compulsory in this State, ownership of some type of liability coverage becomes a concomitant requirement for all of our motor vehicle operators. Partially to meet the needs of those who found it a burden to pay for insurance in one lump sum, American business ingenuity developed a system of premium financing as a distinct form of consumer credit to meet a specific public need. However, as is often the case, this plan created to cure one evil begot others. Included in the mischief which resulted from unregulated premium finance agreements was the extraction of usurious interest and excessive service charges. But, perhaps the greatest danger posed by these agreements flowed from the finance company's right to cancel an insurance policy without notice to the insured when a repayment installment was not made, usually leaving the insured unaware that he was without coverage and significantly jeopardizing the protection available to an innocent victim of the now uninsured's negligence.

In response to these dangers, while at the same time recognizing the great value inherent in permitting premium financing, Maryland in 1964 adopted a statute regulating this form of credit transaction. This law is but one of several statutes which have been enacted by the General Assembly to protect the public from uncompensated injury caused by the operation of motor vehicles upon the highways of this State.[6] It is remedial legislation and, as such, must be liberally construed to advance the remedy which was designed to eradicate and eliminate the mischief found to

---

**6.** *See, e.g.,* Ch. 73 of the Laws of Maryland 1973 and Ch. 836, Laws of Maryland 1957.

exist. An application of the benefits intended by the statute can be achieved only by requiring strict compliance with its regulatory provisions. *Moore v. London Guarantee*, 233 Md. 425, 429, 197 A. 2d 132 (1964).[7] Accordingly, we must follow the ukase of the Legislature contained in Art. 48A, § 486F (a) that an insurance policy "may not be cancelled by the premium finance company unless such cancellation is effectuated in accordance with" the provisions of § 486F (b)-(f). At the crux of this appeal therefore, is what act was chosen by the Legislature to effect the cancellation of an insurance policy when the directive to cancel is initiated by a premium finance company. Fortunately, to discover the Legislature's designation as to what constitutes this terminal point in the life of an insurance policy we need look no further than subsection (f) of § 486F which reads:

"Whenever an insurance contract is cancelled in accordance with this section, the insurer shall return whatever gross unearned premiums are due under the contract to the premium finance company *effecting the cancellation* for the account of the insured or insureds." (Emphasis added.)

Clearly, therefore, cancellation of an insurance policy as controlled by the provisions of this law does not become operative until the unearned premium has been returned by the insurance company to the finance agency. And, as Mrs. Taylor was involved in the pivotal automobile accident on August 4, 1966, a date prior to September 22 of that year when GEICO returned the unearned premium to ICDC, the policy was in full force and effect at the time of the happening of the accident.

By analogy, the opinion of the Court in *German Fire Ins. Co. v. Clarke*, 116 Md. 622, 82 A. 974 (1911), is helpful here. In that case, our predecessors were likewise presented with the question of whether the return of the unearned premium was a condition precedent to cancellation of the policy.

---

7. This requirement of strict compliance is consistent with that of other states which have enacted premium finance laws. 19 Buffalo L. Rev. 656, 666 (1970).

However, instead of being controlled by statutory language as here, the Court in that case was called upon to construe the following contractual language of the policy which read:

> "This policy shall be cancelled at any time at the request of the insured; or by the company by giving five days' notice of such cancellation. If the policy shall be cancelled as hereinbefore provided or becomes void or ceases, the premium having been actually paid, the unearned portion shall be returned on surrender of this policy or last renewal; this company retaining the customary short rate; except that when this policy is cancelled by this company by giving notice it shall retain only the pro rata premium." *Id.* at 624.

The Court concluded that this proviso required an affirmative act on the part of the insurance company as a condition precedent for making effective the cancellation of the policy, *i.e.* the return or tender of the unearned premium. Surely, if such language requires the return of the unearned premium to cancel that policy, the clear and unambiguous language of the remedial legislation at issue here, more definitive in its terms, must be given a similar construction. Accordingly, we affirm the decision of the trial court on this issue, though for a different reason.

GEICO next contends that if it is required to provide the services enumerated in the Taylors' insurance policy, then it is entitled to full indemnification for the expense of these services from the finance company because:

> "but for ICDC's failure to properly cancel the Taylors' policy [by giving a defective notice of cancellation to the insureds] and ICDC's misrepresentation to it it would not have been required to afford insurance coverage for the accident of August 4, 1966, and that, therefore, it is entitled to reimbursement for all of its payments made in consequence of that accident and the resultant suits."

We do not agree. It was GEICO's independent decision not to return the unearned premium until September 22, arrived at without reliance on any statement or action of ICDC, which permitted the policy to be operative at the time of the accident on August 4. Had the unearned premium been returned prior to the accident, a different result might be compelled. But, that's another ball game. We accordingly affirm the trial court on this issue as well.

There remains to be considered the appellees' cross-appeal in which the Taylors ask this Court to reverse Judge Ross's adverse ruling and declare that GEICO, "is responsible in money damages for such investigation and defense as has been expended on behalf of the [Taylors] by reason of the accident of August 4, 1966." The trial judge based this refusal to so declare on his conclusion that all these services were provided by the Fund and GAB at their own expense for the benefit of the Taylors and, as the insureds were under no legal obligation to reimburse them for these costs, the cross-appellants suffered no damage. But, our consideration of the doctrine of subrogation or substitution compels us to reach a contrary result and rule that the cross-appellants as subrogors for the benefit of GAB and the Fund, subrogees, are entitled to the requested declaration. In making this statement, we are not unaware of Maryland Rule 243 a which requires that "the action shall be brought in the name of the real party or parties in interest including those claiming by subrogation." However, it is evident from subsection b of this rule that the penalty for failure to comply with that mandate is not denial of the relief requested or dismissal of the action, but instead, merely a requirement that: "Upon petition of a defendant [not requested here], the court shall order any person to be made a party plaintiff who claims the right to have all or any part of the judgment sought inure to his benefit by subrogation." *See also* Rule 203.

Subrogation, though in principle an equitable doctrine, is recognized and enforced in this State in both law and equity actions. *Schnader, Inc. v. Cole Build. Co.*, 236 Md. 17, 22, 202 A. 2d 326 (1964). The term is succinctly defined in H.

Sheldon, *The Law of Subrogation*, § 1 (2d ed. 1893), as "the substitution of one person in the place of another, whether as a creditor or as the possessor of any other rightful claim." In Maryland the doctrine is recognized as existing in three separate categories: (i) conventional subrogation (by contract or acts of the parties), (ii) statutory subrogation (by legislative enactment), and (iii) legal subrogation. This third form arises by operation of law and is the one we consider to be applicable to the facts in this case. *See* Mullen, *The Equitable Doctrine of Subrogation*, 3 Md. L. Rev. 201 (1938-39) and the cases referred to therein.

Legal subrogation was clearly defined by this Court in *Maryland Title v. Kosisky*, 245 Md. 13, 225 A. 2d 47 (1966), where we stated that:

> "Legal subrogation (as distinguished from conventional and statutory subrogation) arises by operation of law when there is a debt or obligation owed by one person which another person, who is neither a volunteer nor an intermeddler, pays or discharges under such circumstances as in equity entitled him to reimbursement to prevent unjust enrichment." *Id.* at 20.

And earlier in *Schnader, Inc. v. Cole Build. Co.*, 236 Md. 17, 202 A. 2d 326 (1964), we set forth the elements as follows:

> "Although it is difficult to lay down a general rule applicable to all cases in which subrogation is sought, the essential elements necessary for legal subrogation (as distinguished from conventional and statutory subrogation) are: (1) the existence of a debt or obligation for which a party, other than the subrogee, is primarily liable, which (2) the subrogee, who is neither a volunteer nor an intermeddler, pays or discharges in order to protect his own rights and interests." *Id.* at 23.

See also 50 Am. Jur. *Subrogation*, § 10; 83 C.J.S. *Subrogation*, §§ 3, 5.

Once these elements are set forth, and the facts present in this case applied to them, the result we reach becomes

apparent. The first element was satisfied as a result of our decision earlier in this opinion that GEICO and not GAB or the Fund was primarily liable, under the insurance contract, for the expenses of investigating and defending the claims being made against the Taylors. This is so despite the fact that there was no agreement by the Taylors that they would assume the expenses incurred, as legal subrogation may exist without the consent of the creditor. *Schnader, Inc. v. Cole Build. Co., supra* at 23. The second element referred to in *Schnader* is also satisfied as the record clearly demonstrates that neither GAB nor the Fund was a volunteer or an officious intermeddler in discharging the obligation of GEICO as they acted at all times to protect their own interest in preserving the assets of the Fund. One is not a volunteer or officious when he advances money to protect an interest of his own. *Schnader, Inc. v. Cole Build. Co., supra* at 24-25; *Restatement of Restitution* § 162, comment *b* at 654-55 (1937). To hold otherwise would be to unjustly enrich GEICO by saving it the expense which normally and by right it should have incurred.

Therefore, compelled by the principles of equity and by our previous decisions, we reverse the judgment of the trial court and remand the proceedings for the entry of a declaration that GEICO is responsible for the reasonable costs expended on behalf of the Taylors as a result of the accident on August 4, 1966, including the reasonable cost incurred incident to the prosecution of this declaratory judgment action. *Cohen v. Am. Home Assurance Co.*, 255 Md. 334, 258 A. 2d 225 (1969). It follows from what we have said that GEICO's motion to dismiss this cross-appeal must be denied.

> *Motion to dismiss cross-appeal denied.*
>
> *Judgment affirmed in part and reversed in part and the case remanded for further proceedings conforming to the views herein expressed.*
>
> *Costs to be paid by appellant, Government Employees Insurance Company.*