THE GREAT SOUTHWEST FIRE INSURANCE
COMPANY v. THOMAS J. HUSS
ET UX., t/a THE NEW OLD MILL INN ET AL.

[No. 1323, September Term, 1980.]

*Decided September 1, 1981.*

448

The cause was argued before MOORE, MELVIN and MACDANIEL, JJ.

*Bruce R. Miller,* with whom were *Donald C. Allen* and *Allen, Thieblot & Alexander* on the brief, for appellant.

*Doris P. Scott,* with whom was *Robert V. Jones* on the brief, for appellees Huss. *Frederick J. Green, Jr.,* with whom were *Lord, Whip, Coughlan & Green, P.A.* on the brief, for appellee Hardester Corporation.

MOORE, J., delivered the opinion of the Court.

This is an appeal by an insurer from a judgment against it for $29,400 in favor of its insureds in connection with a fire loss; and a cross-appeal by the insureds solely to preserve their right to proceed against their insurance broker and their premium finance company, the other two original defendants, for alleged negligence in failing to effect rein-statement of their cancelled insurance coverage after their indebtedness to the finance company for delinquent install-ments payments had been fully paid. As it was tried, the primary issue in the case was whether the insurer had complied with the insurance contract cancellation provisions

of Md. Ann. Code art. 48A, § 486F; and it was determined that it had not. We find error and reverse the judgment against the insurer. We also reverse the judgments in favor of the broker and the premium finance company, and remand for a new trial of the insured's claims against them.

I

Thomas and Janet Huss, the appellees and cross-appellants (plaintiffs below), purchased from The Great Southwest Fire Insurance Company (Great Southwest), appellant and cross-appellee (one of three defendants below), a fire insurance policy which insured the contents of the "New Old Mill Inn," a tavern in Port Deposit, in the amount of $35,000. The policy became effective on October 21, 1976. Their local insurance agent for some twenty years, L. L. Logan, assisted the plaintiffs in obtaining the policy by contacting the Hardester Corporation, an excess and surplus line insurance agency,[1] which in turn placed the insurance with America's Insurance Center (A.I.C.), an underwriter of insurance and a general agent for Great Southwest. A.I.C. is not a party to this appeal.[2] The premium of $1,365 was paid in full to Great Southwest in October 1976 by Tifco, Inc. (Tifco), a premium finance company through which plaintiffs financed the premium.[3]

---

**1.** This type of agency was described by Edward Dickerson, formerly manager of Hardester's Excess and Surplus Lines Department:

"It's referred to as wholesale insurance. We do not write insurance for the general public, we write insurance for insurance agents and brokers whose companies cannot place certain types of hazardous risks, or risks that are different, that must be tailor-made or changed for certain specifications."

**2.** As stated *infra,* A.I.C. was not named a party defendant by the Husses but was a third-party defendant at the instance of Hardester and Tifco. At the close of all the evidence, the court granted A.I.C.'s motion for a directed verdict. That action is not challenged in the appeal or cross-appeal.

**3.** A premium finance company pays the premium in full to the insurance company and is repaid the amount thereof with interest and finance charges in monthly installments. There is no security for the premium advanced and the insured gives the company a power of attorney, in the premium finance agreement, to cancel the policy in the event of failure to make a monthly installment. Under present law, upon receipt of a Notice

The Premium Finance Agreement provided for nine monthly installments commencing in November 1976 and, in the event of plaintiffs' default, Tifco was authorized to cancel the policy.

Mr. and Mrs. Huss were late in some of their payments and when this occurred again in April 1977, Tifco, pursuant to Md. Ann. Code art. 48A, § 486F, *infra,* sent the plaintiffs a written notice of its intent to cancel the policy. After ten days elapsed, Tifco sent a Notice of Cancellation, effective May 12, 1977, to the Husses, Logan, Hardester, and Great Southwest. (A.I.C. received a copy of the Notice of Cancellation from Hardester and also from Great Southwest.)

Six days later, on May 18, 1977, the Husses brought their payments up to date and made the remaining payments to Tifco on time through July, 1977 when their obligation was fully discharged. On May 19, 1977, Tifco sent a Reinstatement Request to the Husses, Logan, and Hardester, *but not to Great Southwest.* This was a printed form requesting the insurance company to rescind the cancellation and reinstate the policy.[4] The Husses believed that the policy was then reinstated by the insurer. Both Great Southwest and A.I.C. denied at trial that they received the Reinstatement Request despite testimony by a Hardester manager that he mailed it to A.I.C. on May 20, 1977. At all events, the policy was not reinstated and the Husses were unaware of their lack of coverage until after the fire. On this appeal, there is no claim by the Husses of a wrongful refusal by the insurer to reinstate the policy, nor that there was any duty to reinstate the policy if the Reinstatement Request had been received.

Meanwhile, A.I.C. calculated the unearned premium resulting from the cancellation and forwarded to Hardester a credit memo, dated June 10, 1977, which credited

---

of Cancellation from the premium finance company, the insurer has up to sixty days to refund the unearned portion of the premium. The refund is available for reimbursement to the premium finance company for any loss sustained by it because of the insured's default.

4. The lower court ruled, as a matter of law, that there was no duty to reinstate the policy on the part of the insurer, if the policy was legally cancelled. This ruling is not challenged on appeal.

Hardester with a return of the unearned portion of the premium on the plaintiffs' policy.[5] The unearned premium was subsequently paid by check, dated August 17, 1977, from A.I.C. to Hardester.[6]

On July 27, the New Old Mill Inn was destroyed by a fire of unknown origin. Great Southwest did not honor the plaintiffs' claim under the policy of insurance for the contents of the Inn because it said the policy had been cancelled, pursuant to Tifco's notice, effective May 12, 1977, and never reinstated.

Plaintiffs then filed suit in the Circuit Court for Cecil County against Great Southwest, Hardester, and Tifco. They alleged that Great Southwest "failed, as required by statute, to forward to Tifco or plaintiffs the unearned premium ... [or] notify the plaintiffs or their agent that the Reinstatement Request was denied." "Alternate" claims of negligence were separately alleged against Hardester and Tifco, pertaining to Great Southwest's failure to reinstate the policy following cancellation. Hardester and Tifco filed a third-party claim against A.I.C. Great Southwest cross-claimed against Hardester and Tifco.

The court found no actionable negligence by Tifco in its handling of the Reinstatement Request and directed a verdict in its favor. Hardester's "liability" with respect to the reinstatement of the insurance policy was not considered "actionable." The court, however, denied Hardester's motion for a directed verdict.

The case was then submitted to the jury on special issues as follows:

> 1. Was Hardester the agent of Tifco at the time it received the Credit Memo on June 10, 1977 for the purpose of forwarding and returning the premium to Tifco on Plaintiffs' policy?

---

5. There existed a contract between Hardester and A.I.C. entitled "Correspondent's Agreement" which established an open accounting system between them.

6. Hardester did not return the unearned premium to Tifco until on or about May 1, 1980, just a few days before the commencement of trial.

[If the answer to Question 1 was "no," the jury was instructed to ignore Questions 2 and 3, and move on to Question 4.]

2. Did Hardester have a duty to tell the Plaintiffs of its June 10, 1977 receipt of a credit memo from the Insurer for the unearned premium?

Note: If the answer to Question 2 is "no," ignore Question 3.

3. If the answer to Question 2 is "yes," was Hardester's failure to do so the proximate cause of Plaintiffs' loss?

4. Did Hardester Corporation breach its Correspondent's Agreement with America's Insurance Center by failing to return the unearned premium to Tifco, Inc. for the account of the Plaintiffs prior to the loss?

5. In what amount, if any, do you find that the Plaintiffs have sustained damage to contents of the New Old Mill Inn as a result of the fire of July 27, 1977?

6. Shall interest be allowed:

(a) If so, from when?

Because the jury answered "no" to the first issue, a verdict was entered by the court in favor of the Husses and judgment in the amount of $29,400 was entered against Great Southwest in accordance with the jury's response to issue No. 5.

The court entered a judgment nisi for Great Southwest in its cross-claim against Hardester. This was later set aside when the court granted a judgment *n.o.v.* for Hardester.

## II

In the first of these two appeals, Great Southwest seeks a reversal of the $29,400 judgment rendered against it, and maintains principally, as it did below in unsuccessful motions for summary judgment and for a directed verdict,

that the return of the unearned premium was not a condition precedent to effective cancellation by the premium finance company; and that the policy was cancelled prior to the fire loss. In the cross-appeal, seeking to preserve their claims against Tifco and Hardester should their judgment against Great Southwest be reversed, the Husses contend that the court erred in granting a directed verdict for Tifco and in entering judgment for Hardester.[7]

## A. *Appeal by Great Southwest*

The issue presented by Great Southwest was all-pervasive at the trial below and, indeed, has been given primary emphasis by the parties on appeal. The trial court held, as a matter of law, that Great Southwest was required to return the unearned premium to Tifco to complete the act of cancellation. The jury was instructed that unless they found that Hardester acted as agent for Tifco for the return of the unearned premium, the policy was still in effect on the date of the loss and the Husses were entitled to recover.[8] Great Southwest argues that the policy was cancelled by the premium finance company as of May 12, 1977 (before the fire), and therefore, it was under no obligation to satisfy the insureds' loss claim.

Great Southwest's appeal requires us to construe the provisions of Article 48A, § 486F. These provisions, effective now and at the time of the proceedings below, are as follows:

"§ 486F. Cancellation of insurance contracts.

(a) When in connection with a premium finance agreement, a power of attorney or other authority to cancel any insurance contract or contracts on behalf of the insured is given to a premium finance company, *the insurance contract or contracts may not be cancelled by the premium finance company*

---

7. *See* n.17, *infra.*

8. Great Southwest argued alternatively that the issuance by A.I.C. of a credit memo to Hardester crediting Hardester's account with the amount of the unearned premium, was a return of the unearned premium to Hardester.

454

*unless such cancellation is effectuated in accordance with the following provisions:*

(b) Not less than ten (10) days written notice shall be mailed to the insured of the intent of the premium finance company to cancel the insurance contract or contracts unless the defaulted installment payment is received within said ten (10) day period.

(c) After expiration of such ten (10) day period, *the premium finance company may thereafter cancel by mailing to the insurer a notice of cancellation, specifying the effective date of such cancellation,* and the premium finance company shall mail a copy of the cancellation notice to the insured at his last known address. No policy may be cancelled by the holder of a power of attorney because the delinquency and collection charge as provided in § 486E has not been paid.

(d) *Upon receipt of a copy of such cancellation notice by the insurer or insurers, the insurance shall be cancelled effective as of the date specified in the notice as if the aforesaid notice of cancellation had been submitted by the insured himself, but without requiring the return of the insurance policy.*

(e) All statutory, regulatory, and contractual restrictions providing that the insured may not cancel his insurance contract unless notice is given to a governmental agency, mortgagee or other third party shall apply where cancellation is effected under the provisions of this section. The insurer, in accordance with said prescribed notice where it is required to give such notice in behalf of itself or the insured, shall give notice to such governmental agency, mortgagee or other person; and it shall determine and calculate the effective date of cancellation from the day it receives the copy of the notice of cancellation from the premium finance company.

*(f) Whenever an insurance contract is cancelled
in accordance with this section, the insurer shall
return whatever gross unearned premiums are due
under the contract to the premium finance company
for the account of the insured or insureds within a
reasonable time not to exceed 60 days after the
receipt by the insurer of the notice of cancellation,*
or after the completion of any payroll audit neces-
sary to determine the amount of premium earned
while the policy was in force. The audit shall be
performed within 60 days after the receipt by the
insurer of the notice of cancellation." (Emphasis
added.) [9]

The appellees Husses [10] argue that subsection (a) of the
statute requires that all of the conditions in subsections (b)
through (f) in § 486F be met *prior* to cancellation. They rely
on *Government Employees Insurance Company v. Taylor,*
270 Md. 11, 310 A.2d 49 (1973), a case involving the cancel-
lation of an automobile policy by a premium finance
company, wherein the Court specifically held that the return
of the unearned premiums by the insurer to the premium
finance company was a condition precedent to cancellation of
the policy under § 486F and strict compliance with the stat-
ute was required. That case, however, was decided under the
1973 version of the statute. At that time, subsections (d) and
(f) read as follows:

---

**9.** The purpose of the statute, enacted to curb abuses in the previously
unregulated premium finance industry, was summarized in *Government
Employees Insurance Company v. Taylor,* 270 Md. 11, 17, 310 A.2d 49, 52
(1973), as follows:

"Included in the mischief which resulted from unregulated pre-
mium finance agreements was the extraction of usurious interest
and excessive service charges. But, perhaps the greatest danger
posed by these agreements flowed from the finance company's right
to cancel an insurance policy without notice to the insured when
a repayment installment was not made, usually leaving the
insured unaware that he was without coverage and significantly
jeopardizing the protection available to an innocent victim of the
now uninsured's negligence."

**10.** Tifco has submitted no brief on appeal and did not participate in oral
argument.

"(d) Upon receipt of a copy of such cancellation notice by the insurer or insurers, the insurance contract shall be cancelled as if the aforesaid notice of cancellation had been submitted by the insured himself, but without requiring the return of the insurance policy.

(f) Whenever an insurance contract is cancelled in accordance with this section, the insurer shall return whatever gross unearned premiums are due under the contract to the premium finance company effecting the cancellation for the account of the insured or insureds."

The Court of Appeals emphasized the phrase, "effecting the cancellation" in reaching its determination. Judge Digges wrote:

"At the crux of this appeal therefore, is what act was chosen by the Legislature to effect the cancellation of an insurance policy when the directive to cancel is initiated by a premium finance company. Fortunately, to discover the Legislature's designation as to what constitutes this terminal point in the life of an insurance policy we need look no further than subsection (f) of § 486F which reads:

'Whenever an insurance contract is cancelled in accordance with this section, the insurer shall return whatever gross unearned premiums are due under the contract to the premium finance company *effecting the cancellation* for the account of the insured or insureds.'

Clearly, therefore, cancellation of an insurance policy as controlled by the provisions of this law does not become operative until the unearned premium has been returned by the insurance company to the finance agency." (Emphasis in original.)

*Id.* at 18, 310 A.2d at 53. The Court, it appears, construed the words, "effecting the cancellation" in subsection (f) as not

modifying the word, "company." Rather, the words, *"effecting the cancellation* for the account of the insured or insureds," were interpreted as the result of the required return of any unearned premiums.

At the next legislative session after *Taylor,* the General Assembly of Maryland amended § 486F (d) and (f). Very significantly, the 1974 amendment inserted in subsection (d) the words "*effective as of the date specified in the notice*" after the word "cancelled." (Emphasis added.) Equally important was the deletion in subsection (f) of the phrase "effecting the cancellation," [11] upon which the decision in *Taylor* appears to have rested.

The appellees argue that the 1974 amendments to the statute "merely specified the beginning date the insurer should use in computing the 60 day period the insurer had to return the gross unearned premium." That interpretation is off the mark. It completely overlooks the two critical amendments which we have discussed, including the deletion of the phrase underscored in *Taylor.*

In *State v. Fabritz,* 276 Md. 416, 348 A.2d 275 (1975), the Court of Appeals commented on statutory construction as follows:

"The cardinal rule in the construction of statutes is to effectuate the real and actual intention of the Legislature. . . . Of course, a statute should be

---

11. The amended subsections (d) and (f), effective July 1, 1974, in their entirety are as follows:

"(d) Upon receipt of a copy of such cancellation notice by the insurer or insurers, the insurance contract shall be cancelled effective as of the date specified in the notice as if the aforesaid notice of cancellation had been submitted by the insured himself, but without requiring the return of the insurance policy.

(f) Whenever an insurance contract is cancelled in accordance with this section, the insurer shall return whatever gross unearned premiums are due under the contract to the premium finance company for the account of the insured or insureds within a reasonable time not to exceed 60 days after the effective date of cancellation, or after the completion of any payroll audit necessary to determine the amount of premium earned while the policy was in force. The audit shall be performed within 60 days after the effective date of cancellation."

construed according to the ordinary and natural import of its language, since it is the language of the statute which constitutes the primary source for determining the legislative intent. Where there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intention of the Legislature. Thus, where statutory language is plain and free from ambiguity and expresses a definite and sensible meaning, courts are not at liberty to disregard the natural import of words with a view towards making the statute express an intention which is different from its plain meaning." (Citations omitted.) *Id.* at 421-22, 348 A.2d at 278.

We think it plain (following on the heels of *Taylor*) that the insertion by the General Assembly in 1974 of the words "effective as of the date specified in the notice" in subsection (d) and the deletion of the words "effecting the cancellation" from subsection (f), manifest a clear legislative intent that the effective date of cancellation is not when the unearned premium is returned to the premium finance company but the date specified in the Notice of Cancellation issued by the premium finance company.[12] It is plainly stated in subsection (d) that upon receipt of the cancellation notice by the insurer, "the insurance contract *shall be cancelled effective as of the date specified in the notice.*" (Emphasis added.) The return of the gross unearned premiums by the insurer is still a requirement, under subsection (f), but it is not a condition, to the cancellation of the policy.[13] Those conditions are set forth in subsections (b) through (e), inclusive. Subsection (f) applies after the effective date of cancellation.

---

**12.** *Cf.* Stewart v. State, 275 Md. 258, 270, 340 A.2d 290, 296-97 (1975) (inaction of the Legislature following judicial interpretation of a statute deemed presumption of correct interpretation).

**13.** Other changes made by the Legislature to subsection (f) in 1974 as well as an amendment made in 1976 to that subsection are not relevant herein, since they pertain to the beginning of the period from which the insurer calculates the time by which it must return the gross unearned premiums to the premium finance company.

Therefore, the Husses' insurance policy was effectively cancelled as of May 12, 1977, the date specified by Tifco in its Notice of Cancellation received by the insurer. The trial court erred in holding, as a matter of law, that Great Southwest was required to return the unearned premium to Tifco before cancellation could become effective. The judgment in the Husses' favor against Great Southwest must therefore be reversed. The appeal by Great Southwest from the judgment *n.o.v.* in favor of Hardester in its cross-claim need not be addressed; nor need we consider its alternative contention that the issuance of a credit memo by A.I.C. to Hardester crediting Hardester's account with the amount of the unearned premium was a return of the unearned premium to Hardester.

## B. *Cross-appeal by Husses*

In the second appeal herein, the Husses cross-appeal against Hardester and Tifco, although candidly stating that their "main thrust" in the appeal is in their "role as appellee to defend the lower court's ruling as a matter of law." We turn to the issues raised by their cross-appeal.

### 1. *Huss v. Tifco*

In their declaration the Husses pleaded an "alternate claim" against Tifco,[14] alleging that Tifco was negligent in not sending the request for reinstatement to Great Southwest and that, by continuing to accept the premium payments "led them to believe their insurance coverage was intact." At the conclusion of the entire case the court granted a directed verdict for Tifco on the ground that there was no primary negligence on its part and also because the plaintiffs were contributorily negligent as a matter of law.

The record discloses that a premium finance agreement with Tifco was signed by Thomas J. Huss on October 25,

---

14. An "alternate claim" was also alleged against Hardester.

1976.[15] The amount financed was repayable in nine install-
ments of $184.92. The interest rate was 14.5%. On the
reverse side of the printed form, the insured appointed Tifco
as its attorney-in-fact to cancel the policy in the event of
default. As originally typed, the agreement incorrectly
showed Hardester as the insurance company. The testimony,
however, reveals that by November 15, 1976 Tifco learned
that the actual insurer was Great Southwest and its name
and address were inserted in the finance agreement by a
handwritten notation. Nevertheless, the Notice of Cancella-
tion, dated May 12, 1977, again listed Hardester as the
insurance company. It is conceded, however, that Tifco
mailed a copy of the Notice of Cancellation to Great
Southwest.

On the other hand, the Reinstatement Request again
shows Hardester Corporation, not Great Southwest, as the
insurance company and L. L. Logan as the agent. *Tifco failed
to send the Request to Great Southwest,* sending it only to
Hardester, the Husses, and Mr. Logan. The copy sent to the
insured contained a printed message reading in part:

> "This will acknowledge your recent payment. This
> payment was received by Tifco after Cancellation
> Notice had been mailed to the insurance companies
> whose policies were financed under the above
> account.
>
> We wish to draw your attention to that portion of
> the premium finance agreement that provides that
> payments made after cancellation notice has been
> sent are applied solely for reduction of the account
> and not for the purpose of reinstatement of insur-
> ance coverage. Without waiver of this provision,
> and as a courtesy to you, Tifco has advised the
> insurers that your account has been brought up to
> date, and has asked that the cancellation request be
> rescinded.

---

15. The agreement was not executed by Mrs. Huss. The lower court
denied the Husses' motion for a directed verdict against Tifco on that
ground. On appeal they again argue that the nonexecution of the agreement
by Mrs. Huss was fatal. We need not address this issue.

Tifco does not undertake nor warrant that the coverage will be reinstated, or that the insurer will respond to you as a result of our notice. We strongly urge you to contact your insurance agent or broker directly to ascertain the current status of your insurance coverage."

The president of A.I.C. testified that if either Great Southwest or A.I.C. received the Reinstatement Request and "if there was no problem with the file," an endorsement reinstating the policy would have been issued.

The fundamental principles which guide us in any determination of the propriety of a directed verdict were recently stated by Judge Liss for this Court in *Ralph Pritts & Sons, Inc. v. Butler,* 43 Md. App. 192, 403 A.2d 830 (1979), in the following language:

"The standard of appellate review to be employed where a motion for a directed verdict has been ruled upon by the lower court involves a resolution of the question as to whether there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue which, if present, would warrant a finding that the trial court invaded the province of the jury by declaring a directed verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 389 A.2d 887 (1978). Maryland Rule 552 requires submission of a case to the jury if there be *any* evidence, however slight, legally sufficient as tending to prove negligence, the weight and value of such evidence being left to the jury. *Keene v. Arlan's Department Store of Baltimore, Inc.,* 35 Md. App. 250, 370 A.2d 124 (1977); *Krol v. York Terrace Bldg., Inc.,* 35 Md. App. 321, 370 A.2d 589 (1977). And meager evidence of negligence is sufficient to

carry the case to the jury. *Beahm v. Shortall,* 279 Md. 321, 368 A.2d 1005 (1977)." *Id.* at 199-200, 403 A.2d at 835.

Judged by these standards, the conclusion is inescapable that the trial court's action in granting a directed verdict for Tifco constituted reversible error. Although it sent a cancellation notice to the insurance company to protect its loan, it mailed the Reinstatement Request to everyone but the insurance company after the Husses brought their payments up to date. Assuming, without deciding, that there was no duty to request the reinstatement based upon the disclaimer to the insured, quoted above, it is elementary law that once Tifco undertook to request reinstatement, it was required to act with reasonable care. *Kemp v. Armstrong,* 40 Md. App. 542, 546-47, 392 A.2d 1161-64 (1978). Under all the circumstances presented here, the question of Tifco's negligence *vel non* was at the very least a jury question.

Again the issue of contributory negligence on the part of the Husses was also a question for the jury; plainly they were not contributorily negligent as a matter of law. Mr. Huss testified that he assumed that the Reinstatement Request superseded the cancellation notice and that the policy would be reinstated in due course. He was not alone in this assumption. Tifco's own witness, Mr. Bittner, made the same assumption, as did the witness for Hardester, Mr. Dickerson — professionals in the field of insurance.

The court erred in granting a directed verdict for Tifco.

### 2. *Huss v. Hardester*

We reach the same decision with respect to the Husses' "alternate claim" against Hardester.[16] Hardester Corporation was the agent of the Husses in the initial placement of

---

**16.** The Husses' appeal is from the entry of a final judgment in favor of Hardester Corporation against the claims of Thomas and Janet Huss. This was one of twelve judgments entered by order of the lower court on November 21, 1980 after this Court, on its own motion, dismissed appeals of Great Southwest and the Husses under Maryland Rule 605 (a).

the insurance policy and, indeed, is listed as "agent of insured" on the first page of the policy. The former manager of the Excess and Surplus Lines Department of the Corporation, Edward Dickerson, testified that he received from Tifco both the Notice of Cancellation and the request for reinstatement and mailed them himself to American Insurance Center, general agent of Great Southwest, on May 18 and 20, 1977, respectively. Great Southwest and A.I.C. denied receiving the request for reinstatement.

When Great Southwest received the Notice of Cancellation on May 18, 1977, it was forwarded to A.I.C. which, as previously stated, calculated the unearned premium and issued a credit memo to Hardester dated June 10, 1977. It is undisputed that between May 20, 1977 and the date of the fire on July 27, 1977, Hardester made no inquiry of A.I.C. or Great Southwest as to whether or not the Husses' fire insurance policy had been reinstated. It is also undisputed that when Hardester received the credit memo of June 10, 1977 for the unearned premium — the critical evidence that the policy had been cancelled — it did not communicate with the Husses nor with Tifco nor with Mr. Logan, the Husses' local agent. Hardester also received a check for the unearned premium from A.I.C. on August 17, 1977, and on October 20, 1977 Hardester's agent, Mr. Dickerson, wrote a letter to A.I.C. (with a copy to Great Southwest) requesting that the Husses be advised whether or not their claim would be honored. The first paragraph of the letter stated in part:

"As a surplus lines agent utilizing non-admitted carriers, *our agency has a responsibility to our insured.*" (Emphasis added.)

With respect to the duties of Hardester to insurance brokers and to clients for which it had previously written insurance, the president of Hardester, Mr. Bicknell, testified:

"A Our responsibility to Mr. Logan was to attempt to place insurance for him if he came to us, though we assumed no liability for failure to do so,

and assume no responsibility or liability for maintaining that broker's insured with coverage on a continuing basis, as our responsibility was the initial placement. Our responsibility to that broker and his insured, once we obtained a policy of insurance, would be to report any claims to them that were reported to us, and be an intermediary or conduit for the transaction.

THE COURT: Intermediary or conduit for what?

THE WITNESS: For the transaction, *for the insurance policy during its life.*" (Emphasis added.)

In their declaration Mr. and Mrs. Huss based their alternate claim against Hardester upon an alleged duty as their agent "to ascertain whether or not Southwest did or did not agree to reinstate the insurance coverage" and upon a negligent failure to notify them or Tifco that the credit for the unearned premium had been returned. Had they been so notified, it was alleged, they would have sought insurance coverage for the contents of their premises.

At the close of the entire case the court considered a motion by Hardester for a directed verdict and stated: "[t]he motion for directed verdict by the defendant, Hardester . . . is denied with the qualification that Hardester's liability with respect to the Reinstatement Request is not considered actionable by the Court."

Strangely enough, the only issues bearing upon the Husses' claim against Hardester, namely, issues 2 and 3, were not answered by the jury because they were instructed in the event of a negative response to question 1, to ignore questions 2 and 3 and move on to question 4. Question 2 was whether Hardester had a duty to inform the Husses of its receipt on June 10, 1977 of a credit memo for the unearned premium; and 3, to be answered in the event of an affirmative reply to 2, was whether Hardester's failure to notify the Husses was the proximate cause of their loss.[17]

---

17. The record fails to reveal any exceptions to the issues submitted to the jury. Whether or not the Husses waived the question of Hardester's liability by acceding to the method by which the jury was to consider or not

On appeal, counsel for Hardester insists that there was no duty owing from Hardester to the Husses after the insurance policy had been placed and paid for on or about November 15, 1977, and that therefore there can be no liability on the grounds asserted by Huss after the alleged omission of Hardester which occurred in and after May, 1977.

We find no authority, and Hardester cites none, for the proposition that an insurance broker such as Hardester owes no duty to an insured after the policy has been placed and paid for. We observe that Hardester took no exception to the submission to the jury of the question whether or not Hardester in this case had a duty to disclose receipt of the credit memo to Mr. and Mrs. Huss. In any case, it is quite apparent that upon the facts shown a jury question was presented concerning the alleged duty of Hardester, the breach thereof, and whether or not the breach was the proximate cause of the Husses' lack of coverage for their fire loss. Certainly, the testimony of the President and the Department Manager of Hardester as to the responsibility of the company toward its clients, presents a question for the jury as to whether the company failed in its self-perceived role as a middleman or conduit when it failed to advise the Husses or their agent, Mr. Logan, of the receipt of the credit memo showing that their policy had been cancelled, and that their payment of premiums from April through July, 1977, was a wasted effort.[18]

---

to consider the various issues, is not raised on appeal and we do not consider it. We are satisfied, however, that the issues pertaining to Hardester's alleged negligence are properly before us because of the entry by the court of a judgment for Hardester upon the claim of the Husses, from which their cross-appeal has been taken.

**18.** As we conclude this opinion, we deem it appropriate to point out that the ultimate disposition of this litigation would have been facilitated had there been a bifurcation, so that the question of Great Southwest's liability could have been determined first, in a separate trial.

There was sufficient evidence presented to allow the issue of Hardester's negligence to be placed before the jury.

> *Judgment for appellees, Thomas J. Huss, et ux against The Great Southwest Fire Insurance Company reversed; judgment for cross-appellees, Tifco, Inc. and Hardester Corporation against cross-appellants, Thomas J. Huss, et ux reversed and case remanded for trial; costs to be equally divided between the appellees/ cross-appellants, Huss and appellees, Hardester Corporation and Tifco, Inc.*