767 A.2d 824

**AMERICAN LIBERTY FINANCIAL SERVICES, INC.,**

v.

**Melvin Edward COOPER.**

**No. 62, Sept. Term, 2000.**

Court of Appeals of Maryland.

March 2, 2001.

Raymond S. Smethurst, Jr. (Adkins, Potts & Smethurst, LLP, on brief), Salisbury, for appellant.

Leonard Bruce Wade (Robins, Johnson & Wade, on brief), Salisbury, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

WILNER, Judge.

We deal here with the construction of those parts of former Maryland Code, Art. 48A, § 486G, currently codified as Insurance Article, §§ 23–402 and 23–403,[1] which require a premium finance company to give to its customer at least 10 days written notice of its intention to cancel the insurance policy it has financed. The question is whether the statute precludes the company from setting as the effective date of the cancellation a date prior to the end of the notice period. The Circuit Court for Wicomico County answered that question in the affirmative. We agree and shall therefore affirm.

---

[1]. As part of the ongoing code revision process, the provisions of Article 48A were recodified in the Insurance Article, effective October 1, 1997. No substantive changes were made to the law dealing with premium finance companies. Because Article 48A no longer exists, we shall refer, whenever possible, to the sections of the Insurance Article, notwithstanding that the contract at issue is governed by the former provisions of Article 48A.

## BACKGROUND

Premium finance companies play an important role in the implementation of Maryland's compulsory motor vehicle insurance law. In order to provide a fund for the payment of legitimate claims made by persons injured through the operation of motor vehicles, Maryland Code, § 17–104 of the Transportation Article, requires the owner of every motor vehicle to maintain in effect certain financial security. With an exception not relevant here, that security must be in the form of a motor vehicle liability insurance policy containing at least the minimum coverages specified in § 17–103 of that Article. If that required security lapses or is terminated, the registration of the vehicle is automatically suspended as of the date of lapse or termination (§ 17–106), and, upon notice by the Motor Vehicle Administration, the owner must, within 48 hours, surrender all evidence of the registration. If the owner fails to do so, the Administration may suspend his or her driver's license. Lapse or termination may also result in a civil penalty of $150 for the first 30 days of non-coverage and $7 per day thereafter, up to a maximum of $2,500. *See* § 17–106. Any person who drives a vehicle, knowing or having reason to know that the registration of the vehicle has been suspended pursuant to § 17–106, is guilty of a misdemeanor and, for a first offense, is subject to imprisonment for one year and a fine of $1,000. *See* §§ 17–107(a) and 27–101(h).

To the extent that insurance companies have insisted on receiving in advance the full amount of the premiums due on the policy, a problem is created for both fleet and individual owners who cannot afford such an outlay. It is a special problem for persons insured by the Maryland Automobile Insurance Fund (MAIF), which is precluded by law from accepting installment payments or otherwise financing premiums. *See* Insurance Article, § 20–507(f). To meet that need, premium finance companies were formed. Their business is to lend money to persons for the purpose of purchasing liability insurance; they pay the premium to the insurance company and are then reimbursed through a down payment and monthly installments made by the insured. They make

their profit from the higher-than-average interest charged on the loan,[2] but their real protection in the event of a default lies in their ability to cancel the policy if the insured fails to make the installment payments when due and to receive back from the insurance company, as an assignee or on behalf of the insured, the unearned premiums as of the date of cancellation. To that extent, the loan is fully secured.

Until 1964, premium finance companies were largely unregulated in Maryland, and, as we pointed out in *Gov't Employees Ins. v. Taylor*, 270 Md. 11, 17, 310 A.2d 49, 52 (1973), the result was not only the exaction of usurious interest and excessive service charges but the danger that flowed from the premium finance company's right, under its contract, to cancel the insurance policy without notice to the insured when a repayment installment was not made. The effect of that, we observed, was to leave the insured unaware that he or she was without coverage and also to jeopardize the protection that the required security law afforded to innocent victims of the formerly-insured's negligence.

In 1964, the General Assembly added §§ 486A through 486G to Article 48A of the Code, through which, among other things, it (1) required that premium finance companies register with the Insurance Commissioner, (2) limited the fees, interest, and late charges that those companies could charge, (3) required that not less than 10 days written notice be mailed to the insured of the company's intent to cancel the policy unless the defaulted installment payment is received within that period, and (4) provided a procedure for the company to cancel the policy after expiration of the 10–day period and receive from the insurer the gross unearned premiums. *See* 1964 Md. Laws, ch. 141. With certain modifications, that is the law now codified in title 23 of the Insurance Article.

---

2. The interest charged on the loan at issue was at the rate of 26 .16% per annum.

This case arose from a premium finance agreement entered into on January 30, 1997, between Melvin Cooper and American Liberty Financial Services, Inc. (ALFS) to finance the $2,565 premium that Cooper owed to MAIF for the policy year January 30, 1997 through January 30, 1998. Under that agreement, ALFS paid the $2,565 to MAIF, Cooper made a down payment of $285 to ALFS, and he agreed to make 10 monthly payments of $256.22 each, commencing February 20, 1997. The amount payable by Cooper included a $20 service fee and $262.20 in interest, the maximum amounts allowable under the statute. *See* Insurance Article, §§ 23–303 through 23–305. Cooper also agreed to pay a delinquency charge, for any installment in default for more than five days, in an amount equal to 5% of the installment payment, and a cancellation charge in the maximum amount allowed by law.[3]

The relevant statute in effect at the time, § 486G of Article 48A (current §§ 23–402 and 23–403 of the Insurance Article) provided, in relevant part, that:

(a) The insurance contract may not be canceled by a premium finance company unless the cancellation "is effectuated in accordance with this section."

(b) "Not less than ten (10) days' written notice shall be mailed to the insured of the intent of the premium finance company to cancel the insurance contract ... unless the defaulted installment payment is received within said ten (10) day period."

(c) "*After expiration of such ten (10) day period,* the premium finance company may *thereafter* cancel by submitting to the insurer a notice of cancellation, specifying the effective date of such cancellation, and the premium finance company shall mail a copy of the cancellation notice to the insured at his last known address" (emphasis added); and

---

**3.** Insurance Article, § 23–306 allows a delinquency charge of the lesser of 5% of the installment or $5. Section 23–307 allows a cancellation charge in an amount equal to the difference between the delinquency charge imposed under § 23–306 and $10.

(d) "If the insurer receives a copy of the cancellation notice issued under subsection (c) ... within 30 days after the effective date of cancellation specified in the notice, the insurance contract shall be cancelled effective on the date the notice is received by the insurer." ·

In conformance with those provisions, the premium finance agreement contained a power of attorney authorizing ALFS to cancel the policy in the event of "a default in payment of more than 5 days of any installment in full" but further provided, in relevant part, that:

"In exercising its power of cancellation, the Company shall observe the following:

(A) Not less than ten (10) days written notice of intent to cancel policy(ies) unless the default is cured within such ten (10) day period.

(B) If the default is not cured within the ten (10) day period A.L.F.S. in the name of the insured(s) may request the cancellation of insurance policy(ies) by mailing a notice of cancellation to the insurer. A copy of cancellation notice to be mailed to the insured at his last known address."

Cooper was almost in constant default under the agreement. He made his first installment, due February 20, 1997, on time, but was late with respect to each payment thereafter. ALFS developed two different forms of notice in the event of a default—a late notice, captioned "Notice of Intent to Cancel," that informed the insured that an installment payment was past due, and a "Notice of Cancellation." The late notice had a place for two dates—the date the notice was mailed and the due date of the installment. It stated prominently that, in order to avoid cancellation, payment must be received within 15 days from the date the notice was mailed. It stated further that the payment, including late charges, must be received in the ALFS office "prior to cancellation" and that "this is notice of intent to cancel the above policy(ies)."

The "Notice of Cancellation" was routinely sent four or five days after the late notice—before the expiration of the 15–day period. It contained, at the top, one box for "Date Mailed"

and another for "Effective Date of Cancellation." This notice stated that, to avoid cancellation, payment had to be received 11 days from the date mailed. It gave notice that the policy(ies) "is/are cancelled for non-payment of an installment, in accordance with the conditions and terms of the Premium Service Agreement" and that the cancellation "is effective on the above captioned date."

When the payment due March 20 was not made, ALFS, on March 26, sent a Notice of Intent to Cancel, giving Cooper 15 days within which to make the payment. Cooper made the payment by April 3. When he failed to make the April 20 payment, ALFS, on April 25, sent another 15–day Notice of Intent to Cancel, which would have allowed Cooper to make the payment by May 10. On May 1, ALFS sent a Notice of Cancellation, advising that, if the payment was not made within 11 days, the policy would be canceled effective April 23. Cooper made the April payment on May 9. He failed, however, to make the payment due May 20, resulting in a 15–day Notice of Intent to Cancel mailed on May 28 and an 11 day Notice of Cancellation mailed on June 2. The June 2 notice warned that, if payment was not received within the 11 days, the policy would be canceled as of May 23. Cooper cured that default on June 5 but, consistent with his practice, failed to make the June 20 payment.

The default in the June payment is what triggered this case. On June 26, ALFS mailed a 15–day Notice of Intent to Cancel. On its face, that gave Cooper until July 11 to make the payment and avoid cancellation. On June 30, ALFS sent a Notice of Cancellation, confirming that, unless the payment due June 20 was received by July 11, the policy would be canceled effective June 23, 1997, a date prior to both the June 26 and the June 30 notices. On June 27, while he still was insured and had the ability to cure his default, Cooper was driving his car along Route 50 in Salisbury when he was shot in the neck by the occupant of another vehicle, causing him to lose control of his car, crash, and sustain serious injuries. He was transported to the University of Maryland Shock Trauma Center, where he remained under intensive care for several

weeks. Cooper was discharged from the Shock Trauma Center on July 16 and admitted, as an in-patient, to a rehabilitation facility. On June 30, 1997, a claim on Cooper's behalf was reported to MAIF.

On July 23, 1997—30 days after the cancellation date specified in the Notice of Cancellation—ALFS electronically issued a Notice of Cancellation to MAIF. The notice specified June 23 as the effective date of cancellation. The next day, MAIF sent a written notice to Cooper, advising that the policy had been canceled effective June 23, 1997, and remitted the unearned premium of $1,493 to ALFS. ALFS retained that premium to cover the remaining balance owed by Cooper under the Premium Finance Agreement.

In October, 1997, Cooper filed an action in the Circuit Court for Wicomico County against both ALFS and MAIF, seeking a declaratory judgment that, apart from any contractual provisions, the policy could not be lawfully canceled prior to the expiration of the 10–day period prescribed by § 486G, which would have been July 6, 1997, and that the policy was therefore improperly canceled. He asked that the policy be reinstated and that the parties responsible for improperly causing the policy to be canceled be held accountable to him in damages. MAIF cross-claimed against ALFS, asserting that it acted properly in canceling the policy and that, if there was any impropriety in regard to cancellation, the impropriety was on the part of ALFS. It urged that, if Cooper obtained a judgment for damages against MAIF, MAIF was entitled to contribution from ALFS.

The basic facts, consisting largely of the premium finance agreement and the various notices that were sent, were undisputed and were placed into evidence by stipulation. That evidence was supplemented by an affidavit from Alan Bowling, ALFS's president, explaining ALFS's notice policy. Bowling asserted that, at the inception of coverage and from month-to-month thereafter, the insurance is prepaid for only a short period of time and that, based on the down payment made and MAIF's cancellation rate, if Cooper failed to make an install-

ment payment, "ALFS would have to cancel the policy as of the 23rd of the month in order to receive back from MAIF the balance of the money owed to it by Mr. Cooper." He added that it was ALFS's practice to wait until almost the 30th day following the effective date of cancellation set forth in the Notice of Cancellation before formally canceling the policy because experience indicated that, although many people fail to pay the delinquent instalment within the 15 days specified in the Notice of Intent to Cancel, many of them make the payment within a few days thereafter. ALFS's policy, he said, avoided the additional paperwork that would be required if the policy was canceled and then reinstated upon receipt of the delinquent payment. The thrust of his point was that it served everyone's interest to make the effective date of cancellation retroactive but not to implement the cancellation until approximately 30 days after the effective cancellation date.

On cross-motions for summary judgment, the court, on October 27, 1999, entered a declaratory judgment that (1) MAIF was entitled to rely on the cancellation notice sent by ALFS and was under no obligation to investigate to see that proper notices were given to Cooper, and that it therefore was entitled to summary judgment in its favor, but (2) § 486G required that the 10–day notice of intent to cancel be prospective and that, accordingly, ALFS did not comply with the requirements of § 486G in canceling the policy. In light of that second conclusion, the court granted Cooper's motion for summary judgment against ALFS as to liability. It was later stipulated that, had the policy not been canceled, Cooper would have been entitled to uninsured motorist coverage of $20,000 and personal injury protection benefits of $2,500, for a total of $22,500. The court then entered judgment in favor of Cooper against ALFS in the amount of $22,500 and costs. ALFS appealed the judgment against it, arguing that § 486G did not prohibit retroactive cancellation for non-payment and that it therefore acted properly in canceling Cooper's policy effective June 23. The judgment in favor of MAIF was not appealed either by Cooper or ALFS. We granted *certiorari*

prior to any significant proceedings in the Court of Special Appeals to consider the issue raised by ALFS.

## DISCUSSION

The parties agree that the issue is one of statutory construction. ALFS looks to the literal language of the statutes in § 486G(b) and (c) [current §§ 23–402 and 23–403]—one requiring that "[n]ot less than ten (10) days' written notice" be mailed to the insured and the other providing that "[a]fter expiration of such ten (10) day period" the company may "thereafter" cancel the policy by submitting to the insurer a notice of cancellation "specifying the effective date of such cancellation"—and notes that nothing in either statute precludes the effective date of cancellation being a date prior to the expiration of the 10–day period. The statutes, it contends, merely require that the company wait until the end of the period before effecting the cancellation, and thus their only effect "is to delay the operative effect of the cancellation until the waiting period has expired without payment of the delinquent installment." The law, it says, allows the premium finance company to specify the date of cancellation, without restriction, and thus allows it to specify a date prior to the end of the notice period. If the Legislature desired to require that the effective date of the cancellation await the end of the notice period, it could have made that clear, as have legislatures in other States.[4]

ALFS urges that its position is fully consistent with Maryland public policy. It notes that, although the law has long required insurers, as a general rule, to give advance written notice of their intent to cancel or non-renew a policy, there has always been an exception when the cause of cancellation is non-payment of premiums. Section 27–605 prohibits a motor vehicle liability insurer, other than MAIF, from canceling or

---

4. *See* Ga.Code Ann. § 33–22–13(c)(1) (2000); La.Rev.Stat.Ann. § 9:3550(G)(3)(b) (West 1997); N.Y. Banking Law § 576(d) (Consol.1982); N.J.Stat.Ann. § 17:16D–13(c) (West 1984); Vt.Stat.Ann. tit. 8, § 7009(c) (1999).

failing to renew a policy "for a reason other than nonpayment of premium" unless it sends a 45–day written notice of its intent to cancel or non-renew and otherwise complies with the requirements of § 27–605. *See* also § 27–601(c), applying the same rule, with the same exception, to other kinds of insurers. ALFS draws from this that, when the cancellation is for non-payment of premiums, no advance notice of intent to cancel is required. *Ergo*, it asserts, if there is no requirement of advance notice at all, for insurance companies, it cannot be against public policy for the notice required under § 486G (§§ 23–402, 23–403) to provide for retroactive cancellation to the date when the installment was due and not paid. Any other construction, it warns, would afford a defaulting insured free insurance for the period between the default and the effective cancellation, which cannot have been the legislative intent.[5]

Not surprisingly, Cooper has a very different view, of both the statutory meaning and the public policy. Section 486G(c) stated that "[a]fter expiration of such ten (10) day period" the company may "thereafter" cancel the policy. Effecting a cancellation as of a date prior even to the sending of the notice, he urges, cannot be regarded as complying with the statute. If, upon receipt of the notice, he had desired to replace the insurance, he would have been unable to do so. He could not, on or after June 26, have obtained a policy that would have been effective on June 23. The effect of the retroactive date of cancellation would necessarily be to leave him uninsured for some period of time. ALFS responds that, had Cooper lived up to his obligation under the contract, there would have been no cancellation in any event—that Cooper

---

**5.** Although, at the time the contract at issue was made, the law did not require motor vehicle liability insurers to give advance notice of an intent to cancel a policy because of non-payment of premiums, as the result of an amendment to § 27–605 enacted in 2000, the law now *does* require such notice. Section 27–605(c) now states that, at least 10 days before the date a motor vehicle liability insurer proposes to cancel a policy for non-payment of premiums, it shall cause to be sent to the insured, by certificate of mailing, a written notice of intention to cancel. The current public policy, therefore, is to mandate advance notice.

could have avoided cancellation by simply paying the required installment.

ALFS's argument is flawed in a number of respects. The recent amendment to § 27–605, requiring advance notice of an intent to cancel a motor vehicle liability policy for non-payment of premiums, necessarily destroys the parallelism that the company seeks to create—that the Legislature never intended to require advance notice when cancellation is due to non-payment of premiums. Indeed, with that amendment, adoption of ALFS's position would mean that premium finance companies would have greater leeway to cancel a policy than the insurance company itself, and we can find no evidence that the Legislature ever intended that to be the case.

Putting that amendment aside, however, as it was not in effect when this contract was made, the analysis remains flawed for another, converse, reason. Prior to the amendment to § 27–605, the law clearly exempted insurance companies writing motor vehicle liability insurance from the requirement of advance notice of intent to cancel when the cancellation was based on non-payment of premiums. The fact that such an exemption was expressed indicates a recognition by the General Assembly that insurance companies themselves had been accepting premiums in installments, for otherwise the exemption for cancellation (as opposed to non-renewal) would have been unnecessary.[6] The premium finance law, however, from the beginning, specifically required such notice. This indicates to us that, at least until 2000, the Legislature intended to

---

6. That recognition is also implicit from the fact that, in creating MAIF in 1972, the General Assembly expressly prohibited MAIF from directly financing premiums or accepting them on an installment basis and required that any financing of premiums for MAIF policies be done through registered premium finance companies. *See* 1972 Md. Laws, ch. 73, enacting § 243C(c) to Article 48A (current Insurance Article, § 20–507(f)). Such a prohibition would have been unnecessary if it were not the practice in the industry for private insurers to accept premium installments or otherwise finance premiums directly. *See* also 1995 Md. Laws, ch. 475, enacting what is now § 27–216(b)(2)(v) of the Insurance Article, permitting insurers to charge "reasonable installment fees as approved by the [Insurance] Commissioner."

treat premium finance companies differently than insurance companies in this regard; rather than expressly exempting the premium finance companies from the requirement of advance notice of intent to cancel, as it had for insurance companies, it expressly mandated such notice. No reasonable purpose would be served by such a distinction if premium finance companies were able to make the cancellation retroactive, to a date prior not only to the end of the notice period but even to the date of the notice itself.

The effect of a retroactive cancellation, as we have indicated, is to leave the customer uninsured for a period of time, which is not only directly at odds with the mandate of compulsory insurance but would leave the customer (1) subject to the civil penalties noted and, (2) if the customer were to have driven the car during the period knowing or having reason to know that there was no insurance, to the prospect of criminal penalties as well. Worse, as this case well illustrates, it retrospectively removes insurance that, in fact, was in effect when a claim-producing accident occurred. When all of this is taken into account, we have no doubt that, when the General Assembly provided that, upon the expiration of the 10–day period, the premium finance company could "thereafter" cancel, it meant that the specified effective date of the cancellation could not be earlier than the expiration of the notice period. No other interpretation is reasonable. For these reasons, we shall affirm the judgment for $22,500 entered against ALFS.

JUDGMENT OF CIRCUIT COURT AFFIRMED, WITH COSTS.