796 A.2d 758

**Veronica F. MEGONNELL**

v.

**UNITED STATES AUTOMOBILE ASSOCIATION.**

**No. 93, Sept. Term, 2001.**

Court of Appeals of Maryland.

April 15, 2002.

Daniel J. Dregier, Jr., (Jonathan A. Azrael, Judson H. Lipowitz of Azrael, Gann & Franz, LLP, on brief), Towson, for petitioner.

Andrew Janquitto (H. Patrick Stringer, Jr., of Mudd, Harrison & Burch, on brief), Towson, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, CATHELL, HARRELL, BATTAGLIA, and LAWRENCE F. RODOWSKY, (retired, specially assigned), JJ.

CATHELL, J.

On May 16, 1996, Veronica F. Megonnell, petitioner, obtained a jury trial verdict for $291,000 plus costs against her husband, Mr. Megonnell, after an automobile accident. The Circuit Court for Anne Arundel County entered a judgment in favor of petitioner. On January 13, 1999, petitioner filed a Complaint for Declaratory Judgment and Other Relief against United Services Automobile Association (USAA), respondent, in the Circuit Court for Baltimore County. In her complaint, petitioner stated that respondent was obligated to indemnify Mr. Megonnell for the judgment plus post-judgment interest. After oral argument on cross-motions for summary judgment, the Circuit Court for Baltimore County ruled that respondent was obligated to pay the judgment, plus post-judgment interest and costs.

Respondent appealed to the Court of Special Appeals, and petitioner filed a cross-appeal. The Court of Special Appeals reversed the Circuit Court for Baltimore County, holding that respondent did not have to indemnify Mr. Megonnell. Petitioner filed a Petition for Writ of Certiorari to this Court, which we granted. *Megonnell v. U.S. Automobile*, 366 Md. 274, 783 A.2d 653 (2001). Petitioner has presented three questions for our review:

"1. Does the excess coverage portion of the umbrella policy incorporate or adopt by reference the primary policy's household exclusion?

"2. Does the excess coverage portion of the umbrella policy apply to a judgment in favor of a household member when the amount of the loss for the occurrence is above the $500,000 limit of the primary insurance policy?

"3. If the applicability of excess coverage to a judgment in favor of a household member is ambiguous, should the

excess coverage portion of the umbrella policy be construed against the insurer and in favor of the insured?"

We reverse the Court of Special Appeals. We hold that, even if "follow form" clauses [1] are appropriate in Maryland in circumstances such as the present, neither the umbrella policy nor, more specifically, the excess coverage section of the umbrella policy in the case *sub judice* contain a "follow form" clause. Therefore, the family exclusion stated in the primary policy, which is not stated in the excess coverage section of the umbrella policy, is not applicable to the excess coverage section of the umbrella policy. We also hold that the liability limits of the primary policy were exhausted by settlements arising from the same occurrence, so that the excess coverage section of the umbrella policy applied to petitioner's judgment. Thus, petitioner is entitled to recover her judgment against respondent.

## I. Facts

Respondent sold two insurance policies to Mr. Megonnell, a primary auto policy and an umbrella policy. The primary policy provided coverage for bodily injury liability of $300,000 per person and $500,000 per accident. The primary policy contained a household exclusion that would prevent respondent from having to provide liability coverage above $20,000 to Mr. Megonnell in an action filed by petitioner. With the household exclusion in the primary policy, bodily injury liability coverage available to Mr. Megonnell in a suit by petitioner was required to be at least $20,000 by Maryland Code (1977, 1999 Repl.Vol., 2000 Supp.), section 17–103(b)(1) of the Transportation Article. The primary policy provided coverage in that statutory amount. The umbrella policy provided basic and excess coverage and had a policy limit of $3,000,000. The umbrella policy, in essence, did provide a household exclusion for its basic coverage section, but not for its excess coverage section.

---

1. "Follow form" clauses are described, *infra.*

On March 29, 1994, Mr. Megonnell was the negligent driver in a two-car accident. At the time of the accident, there were three passengers in Mr. Megonnell's vehicle—petitioner, and the Megonnells' two grandchildren, Hans and Kendell Anders (the Anders). Petitioner and the Anders sustained serious injuries in the accident. The driver of the other vehicle was also injured. Petitioner and the Anders brought claims against Mr. Megonnell in the Circuit Court for Anne Arundel County. Respondent, pursuant to the insurance policies, defended Mr. Megonnell against the claims. The driver of the other vehicle also brought a claim against Mr. Megonnell, which was apparently settled as it did not result in a lawsuit.[2] Prior to trial, respondent settled the claims of the Anders for $350,000 per grandchild, for a total of $700,000. This settlement sum, if applicable, exceeded the $500,000 per accident liability limit of the primary policy.

Respondent then represented Mr. Megonnell against the claim brought by petitioner. Relying on the household exclusion in the primary policy, respondent offered petitioner $20,000 as the maximum that she could recover. Petitioner rejected the settlement offer and proceeded to trial. On May 16, 1996, a jury returned a verdict for petitioner against Mr. Megonnell for $291,000. Petitioner then sought to have respondent pay the $291,000 pursuant to the excess coverage section of the umbrella policy. Respondent refused and again offered $20,000. Petitioner refused the offer from respondent.

In January of 1999, petitioner filed for a declaratory judgment against respondent in the Circuit Court for Baltimore County. Petitioner sought a declaration that respondent was required to indemnify Mr. Megonnell for the $291,000 judgment, plus post-judgment interest and costs. Following discovery, both parties filed Motions for Summary Judgment. Petitioner agreed with respondent that under the primary policy petitioner was only entitled to $20,000; however, petitioner's contention was that the $700,000 settlement with the

---

**2.** There are no issues in respect to the "other driver" that have been provided to the Court.

Anders made her judgment payable under the excess coverage section of the umbrella policy, which does not have a household exclusion. Therefore, according to her, under the excess coverage section she should be paid the full $291,000. Respondent contended that there could not be any claim under the excess coverage section of the umbrella policy because the household exclusion in the primary policy restricted petitioner to only being able to recover $20,000.

After argument was heard on the motions for summary judgment, the Circuit Court granted petitioner's motion and declared that petitioner's judgment for $291,000, plus interest and costs, was required to be paid by respondent. The Circuit Court stated:

"It is apparent to this Court that although the Household Exclusion (under which [respondent] seeks relief from payment of the judgment) applies to the Primary Policy, it does not apply to the Umbrella Policy. The specific language of the Umbrella Policy states, in pertinent part:

'We will pay for injury or damage for which an insured becomes legally liable . . . .'

'We provide excess liability protection for occurrences covered by primary insurance. We are responsible for the amount of loss above the limit of the applicable primary insurance up to the policy limit.'

"It is undisputed that the policy holder, Mr. Megonnell, is, in fact, liable for the accident that occurred and that said accident was an occurrence covered by Mr. Megonnell's Primary Insurance Policy. Thus, as stated above, the insurance carrier is obligated to pay for 'injury or damage' arising from that liability.

"It has also been shown that Mr. Megonnell had in effect, at the time of the accident, an Umbrella Policy through which excess coverage was to be provided 'above the limit of the applicable primary insurance.' Reading this provision in context with that of the Primary Policy, it is plain that [respondent] is responsible to pay for the amount awarded by the jury, over and above the initial policy limits. [Re-

spondent's] contention that the exclusions applicable to the Primary Policy also apply to [petitioner's] claim against her husband for negligence is unfounded, and ultimately defeats the purpose of purchasing an Umbrella Policy. It is clear that the exceptions language was intended to apply merely to the 'Basic Coverage' and not to the 'Excess Coverage'." [Citation omitted.]

Both petitioner and respondent filed post-judgment motions in the Circuit Court, which amended its declaratory judgment as to the post-judgment interest.

Respondent appealed to the Court of Special Appeals and petitioner filed a cross-appeal. On May 9, 2001, the Court of Special Appeals filed an unreported opinion in which it reversed the Circuit Court for Baltimore County. The Court of Special Appeals held that the household exclusion in the primary policy precluded the excess coverage in the umbrella policy from being applicable to petitioner. The Court of Special Appeals stated:

"Reviewing the Umbrella Policy, we find that it requires the maintenance of a primary policy with coverage limits shown in the Umbrella Policy's Schedule of Primary Insurance. The Schedule of Primary Insurance reflects the limits of the required policy for bodily injury resulting from 'automotive liability' as being '$300,000/$500,000.' The insurer's 'excess coverage' liability is limited to 'occurrences covered by the primary insurance.' As indicated, because of the household exclusion, the Primary Policy provided no coverage to [petitioner] for the occurrence beyond $20,000.

"It is also clear that the Umbrella Policy was intended to pick up excess liability coverage only above the $300,000/ $500,000 limits of the required policy. Until the $300,000/ $500,000 limits of the Primary Policy are reached, there is no excess to be covered by the Umbrella Policy. Otherwise, the Umbrella Policy would become, in effect, the Primary Policy for injury to members of the household and vitiate the household exclusion of the Primary Policy. It is obvious from the household exclusion in both the Primary Policy and the Basic Coverage exclusion of the Umbrella Policy that

the insurer was not insuring members of the Megonnell household except as required by law." [Footnote omitted.] The Court of Special Appeals did not address petitioner's cross-appeal because the court held for respondent. Petitioner then filed a Petition for Writ of Certiorari to this Court, which we granted.

## II. Discussion

We hold that the excess coverage section of the umbrella policy issued to Mr. Megonnell was not a "follow form" policy from the primary policy. Therefore, the household exclusion in the primary policy applied only to that policy and not to the excess coverage section of the umbrella policy. Once the policy limits of the primary policy were satisfied, the household exclusion did not apply to any claims brought under the excess coverage section of the umbrella policy. Petitioner is entitled to the judgment awarded to her by the Circuit Court for Baltimore County.

### A. Summary Judgment

In the case at bar, the Circuit Court for Baltimore County granted petitioner's Motion for Summary Judgment, there being no dispute of material facts. The Circuit Court made a legal determination that petitioner was entitled to a declaratory judgment against respondent. The trial court, in accordance with Maryland Rule 2–501(e), shall grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law."

In determining whether a party is entitled to summary judgment, a trial court will not determine any disputed facts, but rather makes a ruling as a matter of law. *Grimes v. Kennedy Krieger Inst., Inc.,* 366 Md. 29, 782 A.2d 807 (2001); *PaineWebber Inc. v. East,* 363 Md. 408, 768 A.2d 1029 (2001); *Okwa v. Harper,* 360 Md. 161, 757 A.2d 118 (2000); *Sheets v. Brethren Mut. Ins. Co.,* 342 Md. 634, 679 A.2d 540 (1996). This Court has stated that "[t]he standard of review for a

grant of summary judgment is whether the trial court was legally correct." *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996); *see Murphy v. Merzbacher,* 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997); *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 592, 578 A.2d 1202, 1206 (1990).

The Court of Special Appeals has held that summary judgment can be granted in an action for declaratory judgment. In *McBriety v. Commissioners of Cambridge,* 127 Md.App. 59, 65 66, 732 A.2d 296, 299 (1999), that Court stated:

> ' "Summary judgment is appropriate in a declaratory action, although it is " 'the exception rather than the rule." ' *Nationwide Mut. Ins. Co. v. Scherr,* 101 Md.App. 690, 695, 647 A.2d 1297 (1994), *cert. denied,* 337 Md. 214, 652 A.2d 670 (1995) (quoting *Loewenthal v. Security Ins. Co.,* 50 Md.App. 112, 117, 436 A.2d 493 (1981) (holding that in an action for declaratory judgment concerning the correct interpretation of an insurance contract, 'summary judgment may be warranted where there is no dispute as to the terms of an insurance contract but only as to their meaning.'))."

■ While it is permissible for trial courts to resolve matters of law by summary judgment in declaratory judgment actions, the trial court must still declare the rights of the parties. In the present case, the trial court made such a declaration.

We must determine whether sums paid via settlement, as opposed to verdict or judgment, are to be computed in determining whether the policy limit under the primary policy has been met. If the primary policy limit has been exhausted, then we must decide whether the trial court, the Circuit Court for Baltimore County, was legally correct in determining that the household exclusion in the primary policy does not apply to the excess coverage section of the umbrella policy.

## B. The Insurance Policies

As stated, *supra*, respondent sold two insurance policies to Mr. Megonnell. The first policy was a primary auto policy and the second was an umbrella policy. Mr. Megonnell paid an annual premium of $629.58 for the primary policy and an annual premium of $285.63 for the umbrella policy. The primary policy provided coverage for bodily injury liability of $300,000 per person and $500,000 per accident. The primary policy contained a household exclusion that stated:

"We [respondent] do not provide Liability Coverage for you or any **family member** for bodily injury to you or any **family member** to the extent that the limits of liability for this coverage exceed the limits of liability required by the Maryland financial responsibility law." [3]

With the household exclusion in the primary policy, bodily injury liability available to a family member under the policy was "up to $20,000 for any one person and up to $40,000 for any two or more persons, in addition to interest and costs...." Md.Code (1977, 1999 Repl.Vol., 2000 Suppl.), § 17–103(b)(1) of the Transportation Article.

The umbrella policy provided basic and excess coverage and had a policy limit of $3,000,000. The umbrella policy's "Policy Summary" stated:

"Your Personal Umbrella Policy applies to occurrences that are covered by primary insurance; [4] it also applies to some occurrences that are not covered by primary insurance. In either case, coverage applies when you are held legally liable.

"This policy is like others in that it does not cover every situation which may occur. These exclusions are described on page 3."

---

3. At all times relevant to this proceeding, petitioner was considered a family member of Mr. Megonnell.

4. The primary insurance listed in the umbrella policy is the primary policy that respondent had sold to Mr. Megonnell, *supra,* with policy limits of $300,000 per person and $500,000 per occurrence.

The umbrella policy, in the "Excess Coverage" section of the policy, stated:

"We provide excess liability protection for occurrences covered by primary insurance. We are responsible for the amount of loss above the limit of the applicable primary insurance up to the Policy limit. Payment of legal and loss expenses is in addition to the Policy Limit."

The umbrella policy did recognize a household exclusion for its basic coverage,[5] but not for its excess coverage.[6]

Petitioner contends that the settlements with Mr. Megonnell's grandchildren for $700,000 exceeded the policy limits of the primary policy; therefore, the "excess coverage" section of the umbrella policy covers the liability that Mr. Megonnell incurred towards petitioner. Respondent contends that only sums required to be paid as a result of a verdict and judgment are to be utilized in determining that the primary policy's limits have been met. As noted, petitioner also states that the household exclusion in the primary policy does not apply to the umbrella policy. Respondent contends that the excess coverage section of the umbrella policy is a "follow form" policy, meaning that the exclusions in the primary policy also apply to the excess coverage section of the umbrella policy.

As stated, *supra*, in order for the excess coverage section of the umbrella policy to be applicable to a liability claim against Mr. Megonnell, the liability must arrive from an occurrence "covered by primary insurance" and the liability must be a

---

**5.** The "Basic Coverage Exclusions" stated that respondent did not insure liability arising from "injury to you [Mr. Megonnell] or an insured as defined in this policy." Petitioner was included as an insured under this exclusion.

**6.** Under the umbrella policy there was "basic coverage" and "excess coverage." Basic coverage covers occurrences not covered at all under the primary policy. "Basic Coverage" in the umbrella policy at issue here is really a type of additional primary coverage. "Excess Coverage" covers occurrences covered by the primary policy but exceeding the liability limits of the primary policy. Here, we are only concerned with the "excess coverage" section of the umbrella policy. The "household exclusion" provision in the "basic coverage" section of the umbrella policy does not apply to the "excess coverage" section of that policy.

"loss above the limit of the applicable primary insurance up to the Policy limit." There is no dispute between the parties that the accident, which led to the liability in the case at bar, is an occurrence covered by the primary policy. The next step is to determine whether the policy limit of the primary policy has been satisfied to bring the excess coverage section of the umbrella policy into effect.

## C. Settlement Issues

Petitioner contends that the $700,000 cumulative settlements paid to the Anders satisfies the $500,000 per accident policy limit of the primary policy. Respondent counters that the settlements with the Anders should not be included when determining if the policy limits of the primary policy have been satisfied. Specifically, respondent contends that the indemnity obligation in the umbrella policy is contingent on the insured becoming "legally liable," [7] and an insured cannot be legally liable until a jury or court finds that person liable.

Respondent misunderstands the very nature of the legal process itself. The term "legally liable" to pay damages depends not upon when, and if, a judicial determination is made, but, generally, upon the creation of circumstances by and/or between parties, whereby the parties, or one or the other of them, can enforce rights through legal process. Parties often become legally obligated ("liable") to pay by way of contract, i.e., construction contracts, leases, insurance contracts, etc., or by committing tortious acts. The verdict of a jury and the judgment of a court are merely a determination that a legal obligation existed, and continues to exist. The verdict of a jury and the judgment of the court do not, of themselves, create the underlying legal obligation. The underlying legal obligation changes into judgment form—but the legal obligation pre-existed the judgment or the judgment would not have been possible. If a "legal obligation" does not

---

7. The "what's covered" section of the umbrella policy states that respondent "will pay for injury or damage for which an insured becomes legally liable. This liability must arise from an occurrence which takes place during the policy period."

exist until there is a judgment, there would never be a judgment because a judgment of necessity arises out of legal obligations, liabilities, and legal duties.

■ Respondent states that the excess coverage applies "above the *limit* of the applicable primary insurance." By using the singular of the word limit in the excess coverage section of the umbrella policy, respondent asserts that its intention was to have the per person limit of $300,000 only be applicable to the excess coverage. In an occurrence involving multiple claimants, the language in this excess policy referring to the limit is a reference to the $500,000 limit. From the standpoint of the relationship between the company and its insured or the relationship between the company and a claimant, it is ordinarily appropriate to consider that settlement amounts and judgments are charged against the occurrence limit of the underlying policy in the order in which the settlements and judgments are respectively agreed upon or entered.

We do not find respondent's argument to be persuasive and we find no reason why the $700,000 cumulative settlement with the Anders should not be applied toward the $500,000 per occurrence liability limits of the primary policy. To hold otherwise would allow insurance companies in situations like the one in the case at bar—where the insurance company has issued both a primary and umbrella policy to an insured—to settle claims in such a fashion under the primary policy so as to avert liability that would normally be covered under the umbrella policy. In other words, the insurer, having knowledge in cases of multiple claimants of potential coverage exposure greater than the limits of its primary policy, could "settle" some claims for $499,999.99, and then have a judgment of $300,000.00 obtained against its insured by still another claimant arising out of the same occurrence, and claim under the primary policy that it was required to pay only one cent more under the primary policy, and not required to pay anything under the umbrella policy because the $300,000 judgment, by itself, does not exceed $500,000. Other combina-

tions could be employed by such an insurer to avoid responsibility for coverage that it has contracted for with its insured. The language in the insurance contracts at issue here does not limit coverage only to judgments made by a court or jury. (If such language was specifically included serious public policy concerns, as to the use of such language, could be implicated.)

The primary policy states in the Limit of Liability section, that "the limit of liability shown in the Declarations for 'each accident' for Bodily Injury Liability is our maximum limit of liability for all damages for bodily injury resulting from any one auto accident." The maximum liability under the primary policy is all damages arising from the automobile accident. Damages are defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." *Black's Law Dictionary* 393 (Bryan A. Garner ed., 7th ed., West 1999). We examined the definition of "damages" in the insurance context in *Bausch & Lomb, Inc. v. Utica Mutual Insurance Co.*, 330 Md. 758, 780–81, 625 A.2d 1021, 1032 (1993), when we stated:

"Nowhere in the contract is there any express indication that the parties wished to ascribe a special or technical meaning to the term 'damages.' [8] Unlike many other terms used throughout the document, the word is not listed in the policy's definitions section with which the contract begins. We shall, therefore, give the word its ordinary and accepted meaning as used and understood by reasonably prudent laypersons in daily life. Our first resort is to a general dictionary, which defines 'damages' as 'the estimated reparation in money for detriment or injury sustained.' *Webster's Third New International Dictionary of the English Language* 571 (1981). A very similar definition, 'the estimated reparation in money for injury sustained,' is found in Lewis E. Davids, *Dictionary of Insurance* 85 (6th ed.1983). These definitions comport with the trial court's succinct observation that the term means 'anything that a

---

8. There is no indication in the case *sub judice* that the parties intended to ascribe a special definition to "damages."

third party can make you pay for because of damage to that third party's property.' "

Damages are not limited to court-ordered payments; they can be claims made prior to trial that are resolved by settlements requiring the payment of sums of money. If respondent chooses to settle a claim for damages and actually pays the damages without a trial, the damages are still going towards satisfying the "limit of liability for all damages."

The excess coverage section of the umbrella policy also does not exclude settlements of claims from being covered under the excess coverage. The excess coverage section states: "We provide excess liability protection for occurrences covered by primary insurance. We are responsible for the amount of loss above the limit of the applicable primary insurance up to the Policy limit." The excess coverage provides "excess liability protection" and is responsible "for the amount of loss"; it does not restrict coverage only to judgments. Mr. Megonnell would have incurred a loss whether through respondent settling the claims (as with the Anders) or the claims proceeding to trial and a judgment being entered (as with petitioner). We also note that in the case *sub judice,* respondent satisfied the Anders' settlements by making payments from both the primary and umbrella policies. If, as respondent contends, the indemnity obligation in the umbrella policy is contingent on the insured becoming "legally liable" through a judgment, a portion of the insured's settlements would not have been required to be paid under the excess coverage section of the umbrella policy. Respondent has clearly already applied the excess coverage to portions of the Anders' settlements.

In *Bausch & Lomb, Inc., supra,* this Court was examining the application of a comprehensive general liability (CGL) insurance policy. The primary question presented was "whether the insurer [Utica] must defend or indemnify the insured [Bausch & Lomb] as a consequence of groundwater pollution discovered on its industrial site, which entailed expenses of removing soil contaminated with hazardous chemicals." *Id.* at 763–64, 625 A.2d at 1024. The location where

the pollution had occurred was Bausch & Lomb's Diecraft manufacturing facility, located in Sparks, Maryland. In 1982, Bausch & Lomb discovered that the ground had been contaminated near a lagoon used for waste disposal. In 1984, Bausch & Lomb discovered that other areas of the Diecraft site had also been contaminated. Bausch & Lomb commenced a clean-up operation with the help of an environmental engineering and consulting firm. The environmental firm was in contact with the State of Maryland during the clean-up to make sure that Bausch & Lomb was in compliance with State regulations. At no time prior to or during the clean-up was an action against Bausch & Lomb filed by the State, the federal government, or a private party for money damages or injunctive relief.

Bausch & Lomb requested that Utica indemnify it for expenses incurred relating to the clean-up of the pollution at the Diecraft facility. Utica declined to extend coverage and filed an action for a declaratory judgment in the Circuit Court for Baltimore County. The Circuit Court determined that Utica must defend claims and pay damages for clean-up costs. It also found that Utica had to defend future claims if potential for liability existed and the State required removal. The Circuit Court determined that Utica did not have to pay for present or future investigatory or testing costs for the site, and also did not have to pay for State personnel costs for regulatory management of the work. Additionally, Bausch & Lomb was awarded costs, expenses, and attorney's fees. The Court of Special Appeals reversed and we granted the parties' cross-petitions for certiorari.

As relevant to the case *sub judice*, this Court stated that the critical language in the CGL policy was that "[t]he company [Utica] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies." *Id.* at 779, 625 A.2d at 1031 (some alteration in original). We then examined the meaning of "shall become legally obligated to pay," which is similar to the language in the excess coverage portion of the umbrella policy in the case

at bar stating that respondent will pay for damage for which Mr. Megonnell becomes "legally liable." We stated that the relationship between the State and Bausch & Lomb, while not overtly adversarial, always had a threat of formal State intervention. We found that Bausch & Lomb, even though the State had not filed any action against Bausch & Lomb, was required to clean-up the site. We stated:

> "[Bausch & Lomb] *ultimately faced the task* of complying with the environmental laws, and paying the costs of compliance. As such, for the purposes of this analysis, we accept the trial court's finding that [Bausch & Lomb's] response costs, undertaken in the regulatory context, represented a sum the corporation was legally obligated to pay."

*Id.* at 780, 625 A.2d at 1032 (emphasis added). While under a different insurance context, the situation in *Bausch & Lomb* is analogous to the case at bar in that Mr. Megonnell would have "ultimately faced the task" of having to pay the Anders for his negligence. Respondent chose to settle before the case went to trial. We note that in our case, unlike in *Bausch & Lomb,* the Anders had at least filed an action from which Mr. Megonnell needed to be defended, that respondent settled before trial.

In *Garmany v. Mission Insurance Co.,* 785 F.2d 941 (11th Cir.1986), the United States Court of Appeals for the Eleventh Circuit had to determine the starting point of automobile insurance coverage under the umbrella policy. The case arose out of an automobile accident that occurred when James Hamilton received permission to test drive an automobile that was offered for sale by Hutchinson Motor Company. In the accident, one child was killed and three people were injured. At the time of the accident, Hutchinson had a primary insurance policy issued by Fireman's Fund Insurance Company and an umbrella or excess policy issued by Mission Insurance Company. Hamilton, who had no insurance of his own, was, however, covered by Hutchinson's policies. The injured parties brought suit, but, prior to trial, Fireman's Insurance settled the claims against Hutchinson for $200,000.

Hamilton remained the only defendant and the first judgment against Hamilton was for $450,000. At this time, Fireman's Insurance tendered $20,000 to the court on behalf of Hamilton, $20,000 being the amount that Fireman's Insurance was required by law to tender for a permissive user who had no insurance. A second judgment against Hamilton was for $92,809.50, bringing the total judgments against Hamilton to $542,809.50.[9]

Plaintiffs brought suit against Mission Insurance to recover on their judgments under the excess coverage section of the umbrella policy. The trial court found that the umbrella policy issued by Mission Insurance commenced at $500,000. Mission then tendered $22,809.50 [10] to plaintiffs to satisfy the judgments and plaintiffs appealed.

As relevant to the case *sub judice*, plaintiffs contended on appeal that even if the threshold for the umbrella policy was $500,000, the trial court erred by not including the settlements for $220,000 that arose from the same occurrence with the $522,809.50 that had not been satisfied. The Court of Appeals held:

"Finally, we note that the [plaintiffs] argue that even if the district court was correct in determining that there was a fixed threshold point of liability under the Mission policy of $500,000, the lower court nevertheless erred in applying that finding under the facts of this case. We agree. This case involves two sets of claims stemming from the occurrence in question: $220,000 in settlements under the Fireman's Fund primary policy and $522,809.50 in unsatisfied judgments against Hamilton. These settlements and judg-

**9.** This sum does not include the $200,000 that Fireman's Fund paid on behalf of the claims against Hutchinson. The claims, including the Hutchinson settlement and the judgments against Hamilton, totaled $742,809.50.

**10.** As stated, *supra*, Fireman's Insurance had already tendered $20,000 as required by law, this was included in addition to the $200,000 settlement. Therefore, $20,000 of the $42,809.50 above the $500,000 threshold had already been paid by Fireman's Insurance.

ments in aggregate constitute $742,809.50 in claims arising from this occurrence. The primary principle adopted in the body of this opinion is that Mission's liability under the excess policy arises at the *fixed* point of $500,000 *per occurrence*. If that principle is followed, given total claims of $742,809.50, Mission should have a remaining liability of $242,809.50 in excess of the $500,000 threshold limit. The district court, however, determined that Mission's liability under the excess policy commenced at the fixed point of $500,000 as to the $542,809.50 in total judgments against Hamilton. Mission has presented no reason, and we find none, for not including the $220,000 in settlements in computing the total claims arising from this occurrence against which the $500,000 threshold will be applied. Otherwise, as the appellants observe, the practical effect of the district court's holding is to commence Mission's liability after the first $720,000 in claims arising from this occurrence—the $220,000 settlement *plus* the $500,000 threshold."

*Id.* at 948 (footnote omitted).

In *United States Fidelity & Guaranty Co. v. Safeco Insurance Co.,* 555 S.W.2d 848 (Mo.App.1977), among other issues on appeal, Safeco contended that as the excess insurer it did not have any liability for interest until USFG, the primary insurer, had paid the full policy limits. Safeco did not include settlements from the automobile accident paid by USFG as satisfying the primary policy limits. The Court of Appeals held:

"Basically, Safeco maintains that as excess carrier, it has no liability for the interest until USFG, the primary carrier, has discharged its responsibilities by paying the full policy limit. According to Safeco, only payment and not settlement, can discharge a carrier's liability. USFG argues that its liability was exhausted by the settlement and that Safeco as excess carrier became liable to pay the interest under its supplementary policy provision which states: 'Safeco ... agrees ... [to] pay, in addition to the applicable limits of liability ... interest accruing after entry of judgment in any such suit....'

"Safeco, as excess carrier, is liable only when the primary insurer's (USFG) liability has been exhausted. Therefore, our first question is—Was USFG's liability exhausted by settlement or can it only be exhausted by payment of its full coverage as Safeco argues? This court, in *Handleman v. USF & G Co.*, 223 Mo.App. 758, 18 S.W.2d 532 (1929), while emphasizing that exhaustion of the primary insurance was a necessary condition precedent to liability under the excess policy, clearly held that 'Such condition is complied with when the insured proves that claims aggregating the full amount of the specific policy have been settled thereunder and full liability of the insurer discharged.' Based on this precedent, we hold that USFG's liability was exhausted by the settlement with the Alonzos' and Safeco's liability as the excess carrier arose."

*Id.* at 853 (alteration in original).

The automobile accident in the case at bar was an occurrence covered by the primary insurance policy. We hold that the $700,000 settlement sum with the Anders exhausted the $500,000 liability limit of the primary policy. The remaining settlement with the Anders and the $291,000 judgment for petitioner were then covered by the excess coverage of the umbrella policy. The only question remaining is whether there is an exclusion that would prevent respondent from providing coverage under the umbrella policy.

### D. The Household Exclusion

■ Petitioner and respondent agree that the primary policy has a household exclusion that would prevent petitioner from being able to collect all but $20,000 of her judgment under the primary policy.[11] Petitioner contends that with the Anders' settlements exhausting the liability limits of the primary policy, petitioner's entire judgment should be satisfied under the excess coverage section of the umbrella policy,

---

11. As stated, *supra,* under the primary policy petitioner would only be able to recover $20,000 in accordance with the household exclusion and section 17–103 of the Transportation Article.

which petitioner contends does not have a household exclusion. Respondent contends that the excess coverage section of the umbrella policy is a "follow form" policy that carries the household exclusion from the primary policy on into the excess coverage section of the umbrella policy.

"Follow form" policies were examined in *Insurance Coverage Disputes*, which stated:

"Excess insurers frequently agree to provide coverage to an insured in excess of agreed types and amounts of underlying insurance, without having seen copies of the underlying policies or, in many cases, without even knowing the name of the company that is to provide the underlying insurance, leaving such matters 'to be advised.' In the common situation where an insured purchases both primary and excess coverage for a single risk, there are two (or more) separate policies of insurance, each separately negotiated. The insured typically undertakes to obtain primary and excess policies that complement each other in that, upon exhaustion of primary limits, the excess policy will be triggered, thereby fully protecting the insured against the perils for which insurance was initially sought.

"Excess policies often contain 'follow the form' clauses which provide in substance as follows:

It is hereby understood and agreed that in the event of loss for which the Insured has coverage under the Underlying Insurances set out in the Schedule of Underlying Insurances, the excess of which would be recoverable hereunder except for terms and conditions of this Policy which are not consistent with the Underlying, then, notwithstanding anything contained herein to the contrary, this Policy shall be amended to follow the terms and conditions of the applicable Underlying Insurance in respect of such loss.

"Thus, a following form excess policy often incorporates by reference the terms and conditions of the underlying policy. It is well settled that the obligations of following form excess insurers are defined by the language of the

underlying policies, except to the extent that there is a conflict between the two policies, in which case the wording of the excess policy will control."[Citations omitted.]

Barry R. Ostrager & Thomas R. Newman, *Insurance Coverage Disputes* 817–18 (11th ed., Aspen L. & Bus.2002). The question is whether the excess coverage of the umbrella policy in the case *sub judice* is "follow form" coverage and, thus, includes the household exclusion from the primary policy and limits coverage to $20,000 under the umbrella policy.

### E. Analysis

Recently, in our case of *Dutta v. State Farm Insurance Co.,* 363 Md. 540, 769 A.2d 948 (2001), we examined the rules of construction of insurance contracts.

"In *Chency v. Bell National Life Insurance Company,* 315 Md. 761, 766, 556 A.2d 1135, 1138 (1989), we discussed the applicable rules of construction of insurance contracts, stating in part: 'In the interpretation of the meaning of an insurance contract, we accord a word its usual, ordinary and accepted meaning unless there is evidence that the parties intended to employ it in a special or technical sense.' In that vein, insurance contracts are construed as ordinary contracts. *Litz v. State Farm,* 346 Md. 217, 224, 695 A.2d 566, 569 (1997); *North River Ins. Co. v. Mayor & City Council of Baltimore,* 343 Md. 34, 39–40, 680 A.2d 480, 483 (1996). Maryland does not follow the rule that insurance policies should, as a matter of course, be construed against the insurer. *Collier v. MD—Individual Practice Ass'n,* 327 Md. 1, 5, 607 A.2d 537, 539 (1992); *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.,* 117 Md.App. 72, 97, 699 A.2d 482, 494, *cert. denied,* 348 Md. 206, 703 A.2d 148 (1997). Instead, ordinary principles of contract interpretation apply. *Kendall v. Nationwide Ins. Co.,* 348 Md. 157, 165, 702 A.2d 767, 770–71 (1997); *Empire Fire,* 117 Md.App. at 97, 699 A.2d at 493. Accordingly, if no ambiguity in the terms of the insurance contract exist, a court has no alternative but to enforce those terms. *Kendall,* 348 Md. at 171, 702 A.2d at 773. 'Nevertheless, under general principles of contract

construction, if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument.' Empire Fire,* 117 Md.App. at 97–98, 699 A.2d at 494 (emphasis in original)."

*Id.* at 556–57, 769 A.2d at 957.

The construction of ambiguity in respect to exclusions was examined in *Holmes's Appleman on Insurance,* which stated:

"Since the language of the insurance policy is to be construed strongly against the insurer where an ambiguity is found, the insurer must use clear and unambiguous language to distinctly communicate the nature of any limitation of coverage to the insured. Similarly, the exclusion must be conspicuously, plainly and clearly set forth in the policy. An exclusion by implication is legally insufficient. But where the insurer properly and unambiguously uses language in its exclusion, the clear and specific terms must be enforced since the insurer can not be held liable for risks it did not assume. This is because the insurer may freely limit liability and impose reasonable conditions upon the obligations it assumes by contract, provided that the exclusion does not violate statutory mandates or public policy.

"Where the exclusion or limitation is found to be ambiguous, the legal effect is to find that provision ineffective to remove coverage otherwise granted by the insuring agreements....

. . .

"The terms of the exclusion cannot be extended by interpretation but rather must be given a strict and narrow construction.... It has even been held that since exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage."

Eric Mills Holmes & Mark S. Rhodes, *Holmes's Appleman on Insurance, 2d* 276–81 (Eric Mills Holmes ed., vol. 2 § 7.2, West 1996) (footnotes omitted).

As stated, *supra,* the "Excess Coverage" section of the umbrella policy states: "We provide excess liability protection for occurrences covered by primary insurance. We are responsible for the amount of loss above the limit of the applicable primary insurance up to the Policy limit." The parties do not dispute that Mr. Megonnell's accident was an occurrence that is covered by the primary policy and then by the excess coverage section of the umbrella policy. We have held that the policy limits of the primary policy have been exhausted by the settlements with the Anders. Therefore, the excess coverage would provide coverage to petitioner's judgment unless the household exclusion from the primary policy limits the coverage.

■ After an examination of the umbrella policy and, specifically, the excess coverage section of the umbrella policy, we hold that the household exclusion from the primary policy is not applicable to the excess coverage section of this umbrella policy. We hold that in order for the excess coverage to be "follow form" from the primary policy, thereby making the household exclusion applicable, there would, at the least, need to be a conspicuous, clear and express clause that incorporated the exclusions of the primary policy into the umbrella policy. There is no such clause or language in the umbrella policy or in the excess coverage section of the umbrella policy in the case at bar. Without an explicit "follow form" clause in the excess coverage section of the umbrella policy, we cannot infer that the household exclusion contained in the primary policy is applicable to the excess coverage.[12]

## III. Conclusion

The key determination in this case was the application of the two primary sentences of the excess coverage section of the umbrella policy, which states: "We provide excess liability protection for occurrences covered by primary insurance. We

---

**12.** There is no "follow form" language even in the basic coverage section of the umbrella policy. That section has its separate exclusion language applicable, as we have said, only to that section.

are responsible for the amount of loss above the limit of the applicable primary insurance up to the Policy limit." Both parties agree that Mr. Megonnell's accident was an occurrence that was covered by the primary policy. The case then turned to whether the policy limits of the primary policy had been exhausted and whether there were any limitations on the coverage provided by the excess coverage section.

We hold that the settlements with the Anders exhausted the policy limits of the primary policy. We find respondent's contention that only judgments from a jury or court could be used to satisfy the policy limits of the primary policy to be without merit. Respondent's own action in the case belies its contention. By using the excess coverage in the umbrella policy to help satisfy the Anders' settlements, it is apparent that respondent believed that the settlements had satisfied the policy limits of the primary policy and were within the excess coverage.

Once the primary policy limit was exhausted by the Anders' settlement and petitioner's claim was within the excess coverage of the umbrella policy, we had to determine if there was an exclusion limiting coverage. Respondent contends that the excess coverage section of the umbrella policy was "follow form," bringing the household exclusion of the primary policy into the excess coverage.[13] We hold that the umbrella policy

---

13. The dissent argues that the relevant language in the excess coverage section of the umbrella policy is "follow form" language. At oral argument, respondent's attorney was specifically asked by Chief Judge Bell whether the policy contained a type of "follow form" language that had ever been construed by any court as tying the excess coverage policy to the primary policy. Respondent's counsel responded to the effect that it had not.

"CHIEF JUDGE BELL: "Is Mr. Dregier correct that in those cases which talk about follow form policies there is always . . . other language that ties the two policies together? Is there, in other words, an example in the law any place which shows you have this kind of policy without any connecting language where it has been interpreted as a follow form policy?"
Respondent's counsel answered:
"I am not aware of that Your Honor. I can look at the language in the USAA policy and say, 'could it have been written more clearly.'

did not contain a conspicuous, clear, and express clause that made the excess coverage follow the form of the primary policy. Without such a clause, we will not by implication extend the household exclusion from the primary policy to the excess coverage in the umbrella policy. Petitioner's judgment is to be satisfied under the excess coverage of the umbrella policy.

 The Court of Special Appeals did not address petitioner's cross-appeal filed with that court in reference to attorney's fees. She did not present any question in her petition to this Court in respect to that issue. In the interests of judicial economy, we shall, nonetheless, resolve the issue.

 This State adheres to the "American Rule" which generally requires that each party be responsible for their own counsel fees. Among the exceptions to the rule, is an exception for an insured who defends against liability and is forced to challenge decisions of his or her insurer in respect to policy coverage issues.

In *Bausch & Lomb Inc. v. Utica Mutual Ins. Co.*, 355 Md. 566, 735 A.2d 1081 (1999), Judge Eldridge, writing for this Court, stated:

> "Maryland follows the American rule which 'stands as a barrier to the recovery, as consequential damages, of fore-

---

Yes, I think it could have been. But, that's not the test whether it could have been written more clearly. I think what you have to do is look at that language and when you read that policy as a whole try to understand what USAA was doing with the excess coverage and the way you figure out what the excess coverage means is to look at the other type of umbrella coverage provided by the policy and that's the basic coverage. And, traditionally, although all the authorities cited in the briefs indicate that there are two types of excess insurance, one is follow form and the other is stand alone drop down coverage. And the basic coverage is clearly stand alone drop down coverage. And everybody agrees that the basic coverage does not apply. So, from that point, you say well if the basic coverage is stand alone drop down and the only other type of excess coverage there is is follow form. Axiomatically, the excess coverage must be follow form. And that's where I am. And I understand that the language could have been written better but when you read the policy as a whole and in light of the circumstances . . . ."

seeable counsel fees incurred in enforcing remedies for' breach of contract....

"There is one nonstatutory exception to the American rule in actions involving insurance policies. Where an action is brought to enforce an insurer's obligations under the third party liability provisions of a policy, and it is determined that there is coverage under the policy, the insurer is liable for the prevailing party's attorneys' fees. *See, e.g., Mesmer v. M.A.I.F.,* 353 Md. 241, 264, 725 A.2d 1053, 1064 (1999) ('damages for breach of the contractual duty to defend [the insured against liability claims] are limited to the insured's expenses, including attorney fees, in defending the underlying tort action, as well as the insured's expenses and attorney fees in a separate contract or declaratory judgment action if such action is filed [by the insured] to establish that there exists a duty to defend')....

. . .

'From the standpoint of a strict application of the American rule, there is no logical reason why the successful plaintiff's action on a liability insurance policy for breach of a promise to defend, or to pay the cost of defense, should include counsel fees in prosecuting the breach of contract action, when successful plaintiffs' actions for other breaches of insurance contracts, or for breaches of other contracts, do not ordinarily include those counsel fees.' "

*Id.* at 590–92, 735 A.2d at 1094–95 (quoting *Collier v. MD–Individual Practice Assoc., Inc.,* 327 Md. 1, 16–17, 607 A.2d 537, 544 (1992)) (some citations omitted). *See Bailer v. Erie Ins. Exch.,* 344 Md. 515, 687 A.2d 1375 (1997); *Hess Constr. Co. v. Board of Educ. of Prince George's County,* 341 Md. 155, 669 A.2d 1352 (1996); *Nolt v. United States Fidelity & Guar. Co.,* 329 Md. 52, 617 A.2d 578 (1993); *Collier, supra* (quoting *McGaw v. Acker, Merrall & Condit Co.,* 111 Md. 153, 73 A. 731 (1909)); *Continental Casualty Co. v. Board of Educ. of Charles County,* 302 Md. 516, 489 A.2d 536 (1985); *Bankers & Shippers Ins. Co. v. Electro Enterprises, Inc.,* 287 Md. 641,

415 A.2d 278 (1980); *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975); *Gov't Employees Ins. Co. v. Taylor*, 270 Md. 11, 310 A.2d 49 (1973); *Cohen v. American Home Assurance Co.*, 255 Md. 334, 258 A.2d 225 (1969); *Anderson v. Maryland Casualty Co.*, 123 Md. 67, 90 A. 780 (1914).

In this case, petitioner was a plaintiff below and the insured, although he was her husband, was the defendant. The exception at issue, if applicable, would apply to his counsel fees, but not petitioner's. In the circumstances here present, the insurer would not be responsible for petitioner's attorney's fees.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED; THE CASE IS REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE DECLARATORY JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**

RAKER, J., dissenting.

I would affirm the judgment of the Court of Special Appeals on the grounds that the excess coverage in petitioner's umbrella policy is "follow the form" or "follows form" coverage, and, as such, it includes the same exclusions as the underlying primary policy, which does not cover injury to a household member.

There are two principal kinds of excess insurance coverage:

"(1) umbrella excess coverage, and (2) follow form excess coverage. Both insurance products are designed to add to an insured's liability program by extending coverage above the limits provided in the underlying primary coverages. The underwriting involved in these products is distinct, since the primary coverages will usually be sufficient to handle claims brought against the insured. Consequently, excess policies are often purchased from a separate insurer that is competing aggressively in the excess market.

The umbrella policy serves two purposes: (1) to extend coverage above the limits of insurance provided in the underlying primary policies, and (2) to offer coverage not available in the underlying policies. Although there is no standard umbrella coverage form, most insurance companies write this coverage for their commercial insureds. Most policies afford defense coverage in addition to a comprehensive grant of liability coverage that will pay the portion of judgments and settlements in excess of amounts paid by the underlying policies. Umbrella policies cover damages for which the insured is liable on account of bodily injury, property damage, personal injury, and advertising injury arising out of an occurrence. Additionally, coverage is available with a claims—made trigger. Some standard exclusions appearing in CGL and other underlying policies are omitted from umbrella policies, or made less restrictive, in order to broaden the umbrella coverage to fill coverage gaps in the underlying policies.

If an umbrella policy covers an occurrence not covered by the underlying policies, the umbrella policy will 'drop down' and provide primary coverage for the claim, including a defense of the action. In these circumstances, the policy generally will provide coverage only over a 'retained limit' or 'self-insured retention,' which is equivalent to a deductible. Because the insurance carriers participating in this market have developed their own policy forms, any umbrella policy must be reviewed carefully to determine if this drop down insurance coverage exists, especially if no potential coverage exists under the employer's primary liability insurance policies. In a number of cases, employers have sought coverage for employment disputes from their umbrella carrier. Although umbrella policies are often sold by a different insurer than the insurer providing the relevant primary coverage (reflecting the different underwriting and marketing involved), umbrella coverage sometimes is added to the underlying CGL or other liability insurance policy as an endorsement.

'Follow Form' excess liability insurance policies generally provide coverage under the same terms as the primary policy for liability in excess of those policy limits. The typical excess insurance policy will use, or refer to, the same policy language as that in the underlying CGL, Business Auto, Employers Liability or other primary policy. However, some excess policies may contain their own self-contained policy language modifying or deleting defense costs and other coverages contained in the standard underlying policies. As with umbrella policies, there is no standard coverage form."

ERIC MILLS HOLMES & L. ANTHONY SUTIN, HOLMES' APPLEMAN ON INSURANCE § 120.1, at 336–37 (2d ed.2001).

Courts around the country recognize the validity and utility of "follow form" insurance policies. As stated above, an excess policy that "follows form" provides coverage in accordance with the terms and provisions of a primary or underlying policy. "Excess policies normally follow form to an underlying coverage." James M. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate Over the Appropriate Trigger Rule*, 45 DRAKE L.REV. 625, 687 (1997). If the excess insurer does not wish to cover every matter encompassed in the primary policy, the excess insurer must include a clear, unambiguous, and specific exclusion. Jeffrey W. Stempel, *Domtar Baby: Misplaced Notions of Equitable Apportionment Create A Thicket of Potential Unfairness for Insurance Policy Holders*, 25 WM. MITCHELL L.REV. 769, 782 n. 53 (1999). USAA did just that in this case, although it did not explicitly use the phrase "follow form."

Courts give effect to the contract language according to an objective standard of the perceptions of the average person who purchases the insurance policy. HOLMES' APPLEMAN ON INSURANCE § 105.3, at 247. The objective standard for ascertaining the plain meaning is what the common, average person in the market place understands the contract to mean. *Id.; see also Rummel v. St. Paul Surplus Lines Ins. Co.*, 123 N.M. 767, 945 P.2d 985, 989 (1997) (noting that "where a policy fails to explicitly exclude coverage of punitive damages, and instead

adopts a punitive damages exclusion through use of a follow form, the exclusion will be enforced provided the exclusion would have come to the attention of the average insured").

The umbrella policy in the case *sub judice* makes clear that the excess coverage included therein is follow form coverage. The excess coverage portion of the umbrella policy reads as follows:

> "We provide excess liability protection for occurrences covered by primary insurance. We are responsible for the amount of loss above the limit of the applicable primary insurance up to the Policy Limit. Payment of legal and loss expenses is in addition to the Policy Limit."

The basic coverage provision of the umbrella policy reads as follows:

> "We also insure against liability occurrences that are not covered by primary insurance. This applies only if they are not excluded in this policy...."

The majority recognizes that there is a household exclusion to the basic coverage of the umbrella policy. Maj. op. at 644. Because the household exclusion is not referred to explicitly in the excess coverage provision of the umbrella policy, however, the majority summarily concludes that the household exclusion is not included in the excess coverage. *Id.*

Despite the clear language of the excess coverage provision in the umbrella policy, the majority finds that the excess coverage does not follow form to the primary policy. I believe the language in the excess coverage provision of petitioner's umbrella policy is unambiguous with regard to the scope of excess coverage. It states that excess coverage applies to occurrences that are covered by the primary insurance policy. The phrase "we provide excess liability protection for occurrences covered by primary insurance" is, to use the words of the majority, "a conspicuous, clear and express clause that incorporated the exclusions of the primary policy into the umbrella policy." Maj. op. at 657. If the majority means to say that all follow the form clauses must include the phrase "follow the form," or something similar, it is simply mistaken.

A leading insurance treatise states that a typical follow form clause reads as follows:

"The liability of the reinsurer ..., except as otherwise provided by this contract, shall be subject in all respects to all the terms and conditions of the policy issued by the reinsured except such as may purport to create a direct obligation of the reinsurer to the original insured or anyone other than the reinsurer."

HOLMES' APPLEMAN ON INSURANCE § 102.5, at 49. This clause has the same effect as the clause in the case before us: it limits the excess coverage to events covered by the primary insurance without using the phrase "follows the form."

The primary policy in the case before us expressly excludes liability coverage for any family member of the insured. Thus, under the policy, any claim by a family member is barred except as mandated by Maryland's minimum/mandatory insurance requirements under the Financial Responsibility Laws. The primary policy unequivocally bars claims by family members of the insured, and the excess coverage expressly follows the primary. The average insured, if he or she read both policies, would understand that such a claim to be covered must necessarily be covered under the primary policy. A simple reading of the primary policy makes clear that the household exclusion bars petitioner from recovering any amount above $20,000. There is no ambiguity in the primary policy as to the family member.

I agree with Judge Kenney's analysis in the unreported opinion of the Court of Special Appeals in the case below. The court stated as follows:

"Reviewing the Umbrella Policy, we find that it requires the maintenance of a primary policy with coverage limits shown in the Umbrella Policy's Schedule of Primary Insurance. The Schedule of Primary Insurance reflects the limits of the required policy for bodily injury resulting from 'automotive liability' as being '$300,000/$500,000.' The insurer's 'excess coverage' liability is limited to 'occurrences covered by the primary insurance.' As indicated, because of the household

exclusion, the Primary Policy provided no coverage to Mrs. Megonnell for the occurrence beyond the $20,000."

Accordingly, I respectfully dissent.