BEAM, Senior Circuit Judge,
concurring and dissenting:
The plaintiffs, Alpha, RKK, USF & G and American raise discrete and intertwined issues of insurance and indemnity contract interpretation. The district court entered judgment in favor of defendant ICSP on all issues. The majority of this panel acting for the court (the court) affirms the district court on all points except for the question of whether total indemnification is due ICSP under an indemnity/save harmless agreement between MTA and Alpha. I concur in the court’s vacation of the district court’s indemnification award to ICSP and in its remand of the question of Alpha’s duty to ICSP in this regard. I respectfully dissent from the balance of the issues affirmed by the court.
I.
I begin with the indemnity contract dispute between MTA and Alpha over wheth *827 er Alpha and USF & G owed MTA a duty to defend against claims asserted by Griffin against MTA and its employees. The district court found the “save harmless” portion of the indemnification agreement, which I set out in detail below, required Alpha, or its insurer USF & G, to reimburse MTA, or its insurer ICSP, for all costs incurred in defending the various third-party claims asserted by Griffin against MTA in the Maryland trial court. This “duty to defend,” according to the district court, was separate and apart from the obligation of Alpha (through USF & G) to indemnify ICSP for ICSP’s (for MTA) settlement payments to Griffin, an obligation now correctly vacated by the court. It is undisputed that the costs of defending MTA against the Griffin allegations were paid by ICSP. Accordingly, imposition by the district court of this duty to defend MTA upon Alpha and USF & G allows ICSP to step into the shoes of MTA and to be reimbursed for these costs by Alpha or USF & G under the doctrine of equitable subrogation.
This duty to defend MTA, says ICSP, the district court and now this court, emerges from the language of the indemnity agreement between the parties.
The words from which this obligation of Alpha purportedly springs are as follows:
The Consultant(s) [Alpha] shall indemnify and save harmless the Department of Transportation [MTA], the Administration, their Officers, agents, and employees from and against all claims, suits, judgements, expenses, actions, damages and costs of every name and description arising out of or resulting from errors, omissions, negligent acts, negligent performance or nonperformance of the services of the Consultant [Alpha] or those of his subcontractors, agents or employees [Gray] under this Contract, or arising from or based on the violation of applicable federal, state or local law, ordinance, regulations, order or decree, whether by himself or his employees or subcontractors.
Further, the consultant [Alpha] shall pay any claims for personal injury, bodily injury or property damage which the Consultant [Alpha] is legally obligated to pay and shall indemnify the State against such claims [against Alpha]. The Consultant [Alpha] shall undertake to defend any third party claim seeking such damages.
J.A. 157. From this language, neither Alpha nor its insurer USF & G acquired a duty to defend or to indemnify MTA against allegations of negligence or liability leveled against anyone except Alpha and its employees. At best, Alpha’s duty to defend MTA extended no further than a claim against MTA “arising out of or resulting from errors, omissions, negligent acts, negligent performance or nonperformance” of Alpha and Alpha’s employees.
However, such an obligation is not in play in this dispute. USF & G, Alpha’s insurer, incurred all defense costs arising from all claims made against Alpha or its employees. Indeed, ICSP specifically denied Alpha coverage and refused to defend Alpha and its employees. Accordingly, I dissent from the holding of the court that extends Alpha’s duty beyond the indemnity agreement’s specific obligation. It seems probable that the district court’s decision in this regard, now affirmed by the court, arose from the district court’s misinterpretation of the breadth of the indemnity agreement, a misinterpretation that leads the court to reverse and remand the district court’s indemnity judgment.
II.
I next consider the insurance coverages. At the outset, I adopt by reference the facts and circumstances set forth in Part IA of the court’s opinion. I accept in part *828 and reject in part segments of Part IB and repeat other components of the court’s opinion to facilitate and, hopefully, simplify this dissent.
The comprehensive general liability policy issued to MTA by ICSP for the Rogers Avenue station improvement project was part of an “owner controlled insurance program” (OCIP), a program formulated by MTA for most, but not all, of its major projects. OCIPs, also known as wraparound insurance programs, provide insurance, such as the coverage provided by ICSP, for the contractors or subcontractors providing direct manual or non-manual labor or service personnel at the weatherization construction sites. J.A. 73. An OCIP policy insures against risk of loss arising from, among other things, property damage, personal injury and workers’ compensation claims. Endorsement MS # 00005 of the ICSP agreement states that the ICSP “policy is primary.” J.A. 53. Accordingly, under MTA’s OCIP, ICSP was the primary (first to pay) insurer for the Rogers Avenue station improvement project even when MTA’s contractors and their subcontractors provided their own contract-mandated insurance coverage. See, e.g., id. at 77. Alpha purchased comprehensive liability coverage for itself and its employees from USF & G and RKK purchased similar coverage from American. MTA and its employees, as required by the contract, were named additional insureds under the USF & G and American contracts. Thus, MTA and its employees were insured under at least these three policies. However, since ICSP is the primary policy for the project, the USF & G and American insurance represents excess coverage which comes into play only if the limits of the primary policy are exhausted. There is no evidence that ICSP’s total obligations in this regard have been exceeded. And, although ICSP provided both a defense and indemnification for MTA and some of its employees, as well as for Maple and its employees, for the Griffin claim, it has denied coverage for Alpha and RKK and their employees Gray and Combs.
As noted by the court, Alpha and RKK and their insurers, USF & G and American, filed this action seeking a declaratory judgment that Alpha and RKK were insured by the ICSP policy and that their employees, Gray and Combs, were also employees of MTA and, thus, insureds under the ICSP policy. Alpha and RKK likewise sought a declaration that ICSP owed Alpha and RKK and Gray and Combs a duty to defend the Griffin suit and a duty to indemnify and reimburse their insurers USF & G and American for the Griffin settlement contributions made by them in return for the Griffin release. ICSP counterclaimed against Alpha or its insurer, alleging that it is entitled to contribution or indemnity from Alpha or its insurer for the costs it incurred in defending MTA and in paying $400,000 to settle the Griffin lawsuit.
Upon cross-motions for summary judgment, the district court granted judgment in favor of ICSP, finding that clear policy language precluded Alpha and RKK, or their employees, from being insureds under MTA’s OCIP policy. The district court found that Alpha and RKK were excluded from the policy because they were not listed as companies on the enrollment list kept by MTA as part of the OCIP. Furthermore, the district court concluded that though possibly qualifying as “Named Insured[s]” under the insuring language of the ICSP policy, Alpha and RKK were specifically excluded from protection by virtue of Endorsement MS # 00006 (Endorsement 6) * which was ap *829 pended to the policy. In support of this holding, the district court found that the employees provided to MTA by Alpha and RKK were not endorsed for workers’ compensation and employer’s liability coverage as required by Endorsement 6. Accordingly, said the district court, such employees were not “insureds” under the ICSP policy and because of this Alpha and RKK were, likewise, not entitled to reimbursement from ICSP. Finally, the court ruled in favor of ICSP on its counterclaim, holding that Alpha was required to reimburse ICSP for the $400,000 ICSP contributed to the Griffin settlement. Alpha, RKK, USF & G and American appeal the district court’s judgment.
III.
On appeal, rather than continuing to argue that they, as entities, are covered by ICSP, Alpha and RKK confine their arguments to the employment status of Gray and Combs as they performed their duties for MTA at Rogers Avenue at the time of Griffin’s injury. Such status raises two separate issues, one under Maryland tort law and the other under the insurance contracts. But, both issues affect ICSP’s insurance obligations.
A.
Maryland tort law, and duties and obligations arising thereunder, is not, of course, governed by the content of insurance policies or even the existence, or not, of insurance coverage. Insurance indemnity benefits come into play only after liability to a tort claimant has been determined under Maryland law.
Gray and Combs were furnished to MTA by Alpha and RKK respectively. As established by their MTA contracts, Alpha and RKK were the general or administrative employers of Gray and Combs and MTA was the functioning and controlling employer. Specifically, Alpha, RKK, Gray and Combs had no authority to make changes in the plans and specifications of the Rogers Avenue work or any other portion of the weatherization project to which they were assigned. They had no input into work assignments and were, in fact, dispatched to Rogers Avenue by their immediate MTA supervisor on the day in question. They were directed, supervised and managed on the project by MTA employees and supervisors. Under the agreement, MTA reviewed and approved their qualifications and had the right to accept, or not, their services and to terminate them at any time for any reason. Indeed, MTA was in full control of their actions at the Rogers Avenue site. Upon receiving contract-specified payments from MTA, Alpha and RKK paid Gray and Combs, made and submitted required deductions, paid fringe benefits, if any, and provided workers’ compensation benefits, if necessary, although it is virtually certain that under Maryland law MTA also had a workers’ compensation undertaking to Gray and Combs as well. In Maryland when an employee is employed jointly by two employers, both are liable, primarily or secondarily, for workers’ compensation benefits regardless of any agreements between the two employers. Temp. Staffing, Inc. v. J.J. Haines & Co., 362 Md. 388, 765 A.2d 602, 606 n. 7 (2001). The Code of Maryland Regulations 14.09.01.08 permits *830 a party to implead alleged co-employers in a compensation case. Chaney Enters. Ltd. P’ship v. Windsor, 158 Md.App. 1, 854 A.2d 283, 246 (2004).
Alpha and RKK provided Gray and Combs small tools (rulers and hand levels), safety equipment (hard hats and safety vests) and mobile phones all of which items were also available to MTA personnel. For tort liability purposes, the recognized factors in determining the existence of an employment relationship under Maryland law are: (1) who has the power to select and hire the employee; (2) who pays the wages; (3) who has the power to discharge; (4) who has the power to control the employee’s conduct; and (5) whether the work is part of the regular business of the employer. Mackall v. Zayre Covp., 293 Md. 221, 443 A.2d 98, 103 (1982). If both employers have the power to perform a number of these five functions, the employee will be considered an employee of both. Id. Of these five factors, “control is paramount and, in most cases, decisive.” Great Atl. & Pac. Tea Co. v. Imbraguglio, 346 Md. 573, 697 A.2d 885, 894 (1997). Thus, under the circumstances of this case, Gray and Combs were, under Maryland precedent, borrowed servants. And, in this regard, it is a settled principle of Maryland law that a worker may simultaneously be the employee of two employers. Lovelace v. Anderson, 366 Md. 690, 785 A.2d 726, 741 (2001). That an employee can concurrently serve two employers is not a novel concept in Maryland. Id. Thus, the initial question is whether under the applicable facts, MTA, as a joint employer, became vicariously liable to Griffin for negligent acts, if any, performed by Gray and Combs at the Rogers Avenue station at the time Griffin was injured. As a matter of Maryland law, there seems to be little doubt that MTA did become liable. Gray and Combs were going about MTA’s business, acting within the scope of their contracted-for relationship with MTA and, at the time of the incident with Griffin, were under the complete control of MTA supervisors. See S. Mgmt. Corp. v. Taha, 378 Md. 461, 836 A.2d 627, 638 (2003).
As a panel of this circuit previously noted:
The borrowed servant doctrine arose as a means of determining which of two employers, the general employer or the borrowing employer, should be held liable for the tortious acts of an employee whose conduct injured a third party and who, although in the general employ of the former, was performing a task for the latter. See Standard Oil Co. v. Anderson, 212 U.S. 215, 220, 29 S.Ct. 252, 53 L.Ed. 480 (1909) (“[W]hen ... an attempt is made to impose upon the master the liability for [the servant’s tortious acts], it sometimes becomes necessary to inquire who was the master at the very time of the negligent act or omission.”). The Supreme Court summed up the doctrine as follows: “One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred ... to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation.” Id.
NVR, Inc. v. Just Temps, Inc., 31 Fed.Appx. 805, 807 (4th Cir.2002) (alterations in original).
Thus, if Gray’s and/or Combs’s acts of negligence, if any, were the cause, in whole or in part, of Griffin’s damages, MTA was vicariously liable for the consequences of such behavior. So, whether or not Gray and Combs were insureds under the ICSP policy, MTA had tort liability to Griffin covered by ICSP’s primary policy. With regard to MTA’s responsibility to Griffin, ICSP’s insuring agreement states: “[ICSP] will pay those sums that the insured [MTA] becomes legally obligated to *831 pay ... because of [damages] to which this insurance applies.” J.A. 24. The ICSP insurance clearly applies in this situation and ICSP as primary carrier is obligated to first pay all MTA losses within the limits of its coverage.
While Maryland law permits contractual allocation of risk between a general employer and a borrowing employer under the borrowed servant doctrine, Sea Land Industries, Inc. v. General Ship Repair Corp., 530 F.Supp. 550, 563 (D.Md.1982), the record discloses no indemnity agreement whatever between MTA and RKK and the indemnity agreement between MTA and Alpha set forth above fails to allocate all risk of a controlling employer to a non-controlling employer or if it does, the contract is void under that reading. Bethlehem Steel Corp. v. G.C. Zarnas & Co., 304 Md. 183, 498 A.2d 605, 610-11 (1985). And, this court has already unanimously determined that the MTA/Alpha agreement does not shift all risk of loss from MTA to Alpha.
Accordingly, at the bottom line, if Gray and/or Combs were negligent, MTA, as their employer, incurred liability to Griffin arising out of such acts under the doctrine of respondeat superior. Thus, ICSP had a duty to MTA under the coverage extended by its primary policy to pay for any provable damages suffered by Griffin. If negligent, Gray and Combs were, of course, also jointly and severally liable to Griffin. Taha, 836 A.2d at 638. However, there is no evidence, or even an allegation, in the record that Gray and Combs were solely liable for the injury. Indeed, the record indicates that Gray and Combs were dispatched to Rogers Avenue by MTA upon receipt of a report of a pre-existing safety hazard at that location, possibly the handiwork of Maple, the general contractor. On these facts, ICSP denied coverage under its policy to Gray and Combs who then looked to USF & G and American, the excess carriers, for indemnification. USF & G and American responded to ICSP’s primary insurance obligations and are now entitled to indemnification by and reimbursement from ICSP.
B.
Analysis under Maryland tort law does not end the inquiry into ICSP’s responsibilities to Gray and Combs. As noted above, even though an employer is vicariously liable for the negligent acts of its employee, the employee may also be personally liable to a tort claimant and possibly, in a few instances, to a totally blameless employer. Hartford Accident & Indemnity Co. v. Scarlett Harbor As-socs. Ltd., P’ship, 109 Md.App. 217, 674 A.2d 106, 135 (1996). As such, Gray and Combs had an insurable interest in acquiring comprehensive liability coverage for themselves to provide indemnification for such potential obligations. As employees of Alpha or RKK, they acquired such coverage through the USF & G or American policies. But, if Gray and Combs were also employees of MTA as defined in the ICSP policy, they acquired their primary indemnity coverage under that policy. Such coverage would entitle them to a policy defense and indemnification for liability arising from any actionable behavior.
With that background, I turn to the key question in this coverage dispute: were Gray and Combs ICSP-covered employees of MTA at the time of the Griffin incident? I turn to the policy’s language for the answer. I digress, however, to mention some interpretational rules applied in Maryland insurance contract disputes. The initial burden of proof is placed upon an insured seeking coverage under a policy’s insuring language. Perdue Farms Inc. v. Nat’l Union Fire Ins. Co., 197 F.Supp.2d 370, 376 (D.Md.2002). However, when the *832 insurer seeks to diminish or restrict, by endorsement or written addendum, otherwise proffered policy coverages, the burden of proof is reversed because the exceptions or exclusions essentially become affirmative defenses. As such, validation of the application and efficacy of policy limitations is the burden of the insurer. Mut. Fire Ins. Co. v. Ackerman, 162 Md. App. 1, 872 A.2d 110, 114 (2005). Cf. Boyd & Stevenson Coal Co. v. Director, Office of Workers’ Compensation Programs, 407 F.3d 663 (4th Cir.2005) (applying applicable state insurance law in construing insurance contract). Any coverage exclusions or exceptions in policy definitions must be conspicuous and plainly and clearly set forth in the contract. Megonnell v. United Services Auto. Ass’n, 368 Md. 633, 796 A.2d 758, 772 (2002). Also, terms of exclusion cannot be extended by interpretation but must be given strict and narrow construction. Id. Since exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of finding coverage. Id.
As stated by the court, the district court relied upon Endorsement 6 and some related collateral actions to answer the question posed above in the negative. Endorsement 6, according to the district court, required a contractor (here Alpha or RKK) to “effect” ICSP coverage by specifically endorsing its employees for workers’ compensation and employer liability coverage “to the policy.” Finding no such endorsement in the OCIP spreadsheet maintained by MTA, the district court concluded that Gray and Combs were not ICSP insureds.
The district court additionally opined, somewhat inconsistently, that it “need not determine” whether Gray and Combs could be properly characterized as employees or leased workers of MTA because to do so would “circumvent” the endorsement’s “clear exclusion” under the policy and render the endorsement superfluous because it would permit Alpha and RKK as uninsured entities under the ICSP policy to use an equitable subrogation remedy to override a written policy exclusion. J.A. 780. These conclusions are problematic for at least three reasons.
First, an ambiguity exists as to who the district court believes is clearly excluded by the endorsement-the contractors, the contractors’ employees or both. Second, while Endorsement 6 uses the nonendorsement of a contractor’s employees for workers’ compensation benefits and employer liability coverage as the key to excluding the contractor, here Alpha and RKK, from ICSP coverage, nothing in the endorsement excludes the contractor’s separately insurable workers, especially ICSP-policy-defined MTA leased workers. So, there is no “clear exclusion” of Gray and Combs stated, especially when the aforementioned rules of interpretation are correctly applied.
Third, Endorsement 6 is not superfluous. The endorsement may be inoperative when a contractor’s worker is entitled to ICSP insurance coverage under policy language unrelated to Endorsement 6’s “contractor” exclusion. But, otherwise, the endorsement is fully effective to fulfill its purpose. Indeed, it has served to exclude Alpha and RKK and any employees not under the control of MTA, if any, performing services for the weatherization project. But even if Endorsement 6 is deemed superfluous and collides with the other clearly stated insuring language in the ICSP policy, the endorsement must yield because terms of exclusion cannot be extended by interpretation but must be given strict and narrow construction. Megon-nell, 796 A.2d at 772. I turn now to the coverage language.
*833 Section II.2.a. of the ICSP policy states that an MTA employee is “an insured.” J.A. 29. Section V.5. of the contract further notes that an employee “includes a ‘leased worker’ ” but such an employee “does not include a ‘temporary worker.’ ” Id. at 32. The ICSP policy defines “leased worker” as “a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business.” Id. at 33. A “temporary worker” is defined as “a person who is furnished to you to substitute for a permanent ‘employee’ on leave or to meet seasonal or short-term workload conditions.” Id. at 34-35.
In Gray’s case, he was assigned to MTA by Alpha in July 2002 and worked solely and continuously thereafter on the weatherization improvement project. He testified that during his Alpha employment, he worked only for MTA. And, there is no evidence that he worked seasonally or short-term or that he substituted for anyone. In Combs’s case, he had worked at MTA long enough that he had reached the highest class of inspector.
Although the terms “leased worker” and “temporary worker” appear in numerous insurance contracts, and are mentioned in numerous court opinions, there is a dearth of cases definitionally analyzing leased worker status. As noted by the parties, Scottsdale Ins. Co. v. Torres, 561 F.3d 74 (1st Cir.2009), stands almost alone in this regard. We look to it for some guidance.
In Torres (a case not quite factually on point because it involved an “employer’s liability” exclusion under which a “temporary worker,” as defined, was protected against the negligent acts of an employer but a “leased worker,” as defined, received, instead, scheduled workers’ compensation benefits), Venturi hired individuals and placed them with client companies for varying lengths of time. CTC contracted with Venturi to supplement its workforce. Venturi paid the supplied worker, withheld taxes and took responsibility for workers’ compensation benefits. While Venturi retained the right to hire, place, discipline and terminate its employees, CTC was responsible for training, supervision and assigning work tasks. CTC could ask a worker not to return. Torres worked from August to December 2003 and from January 2004, except for a week in June, until August 2004, when an accident occurred. While the Venturi/CTC contract did not mention the term “lease,” it used definitions of “leased” and “temporary” workers identical to those used in this case. On these facts, the First Circuit found Venturi to be a “labor-leasing firm,” found the agreement to be a lease and found that Torres was a “leased” worker within the applicable definition. Id. at 78. In Torres, evidence not present in this case made the temporary worker exclusion a fact question. In this case, however, under the narrow interpretation to be given coverage limiting language, it is clear that Gray and Combs do not fit within the “temporary worker” definition. They were leased workers under the ICSP policy as a matter of law.
As leased workers, Gray and Combs were insured employees of MTA and, thus, fully insured by the ICSP policy. Even so, ICSP denied them coverage. At that point, Gray and Combs looked to USF & G and American who provided them with a defense and indemnified them from losses in the amount of $400,000. Accordingly, USF & G and American, as excess carriers to the primary policy issued by ICSP, are entitled to step into the shoes of their insureds Gray and Combs and to be reimbursed by ICSP under the doctrine of equitable subrogation. See Fireman’s Fund v. Cont’l Ins. Co., 308 Md. 315, 519 A.2d 202, 204 (1987) (“Equitable subrogation arises by operation of law when a *834 person pays the debt of another under such circumstances that equity entitles the person to reimbursement.”).
In Fireman’s Fund, Glen Falls Insurance, a subsidiary of Continental, issued Publication Press a primary comprehensive general liability policy with limits of $500,000. Fireman’s issued Publication an excess policy with a $2 million limit. A former employee sued Publication for $15 million in compensatory and $15 million in punitive damages. Although warned by its counsel of the likelihood of a verdict in excess of its policy limits, Glen Falls repeatedly refused to settle within the limits. Upon the rendering of a jury verdict of $1 million, settled for $900,000, Fireman’s was forced to pay the $400,000 excess. The Maryland Court of Appeals ruled that Fireman’s was entitled under the doctrine of equitable subrogation to step into the shoes of Publication to pursue Publication’s bad faith claim (for not settling within policy limits) against Glen Falls to recover Fireman’s payment of $400,000. Id. at 205.
Applying this precedent, USF & G and American are entitled to reimbursement from ICSP in the amount of $400,000 plus Gray’s and Combs’s defense costs. I dissent from the court’s conclusion to the contrary.

 Endorsement 6 provides that "coverage for 'Named Insured(s)' shall be automatically effected based upon issuance of a workers com *829 pensation policy as afforded by the wrap-up program/owner controlled insurance program.” Endorsement 6 also states that the policy "does not apply to any of the following as an insured: ... [e]xcept as respects to any contractor or subcontractor who will have employees engaged in work at the project hereof who are not provided workers compensation and employers liability coverage under the owner provided insurance program, unless specifically endorsed to the policy.”